THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>MINE SHAFT BREWING LLC, a Delaware limited liability company; TIMOTHY A. NEMECKAY, an individual; and CHARLIE V. WHITTINGTON, an individual,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING PLAINTIFF'S [47] MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:21-cv-00457-DBB-JCB<br><br>District Judge David Barlow |

Before the court is Plaintiff U.S. Securities and Exchange Commission's (the "SEC" or "Commission") Motion for Summary Judgment.[1] The Commission moves for partial summary judgment against Defendant Charlie V. Whittington ("Mr. Whittington") for alleged violations of Sections 5(a) and 5(c) of the Securities Act of 1933 (the "Securities Act") and Section 15(a)(1) of the Securities Exchange Act of 1934 (the "Exchange Act"). For the reasons below, the court grants the Commission's motion.[2]

## BACKGROUND

Mine Shaft Brewing LLC ("Mine Shaft") is a Delaware limited liability company registered to conduct business in Utah.[3] It is a member-managed LLC with Timothy A.

---

[1] Mot. for Summ. J., ECF No. 47, filed Mar. 21, 2023.
[2] Having reviewed the briefings and relevant law, the court finds that oral argument would not materially assist in resolving the matter. *See* DUCivR 7-1(g).
[3] Compl. ¶ 19, ECF No. 2, filed July 27, 2021; Answer ¶ 19, ECF No. 28, filed Mar. 21, 2022.

Nemeckay ("Mr. Nemeckay") as its only manager.[4] Mine Shaft originally planned to build a brewery and restaurant in Park City, Utah to market malt liquor, beer, and hard cider.[5] Later, Mine Shaft sought to operate in Santa Clarita, California and sell a line of hard seltzer beverages.[6] At no time did Mine Shaft file a registration statement as to any securities offerings.[7]

*Mine Shaft's Founder and President, Mr. Nemeckay*

Mr. Nemeckay founded Mine Shaft in 2013.[8] He serves as its president, secretary, and board manager.[9] In April 2014, the Utah Division of Securities (the "Division") filed a Notice of Agency Action and Order to Show Cause against Mr. Nemeckay.[10] The Division alleged Mr. Nemeckay committed securities fraud and licensing and registration violations between 2011 and

---

[4] Compl. ¶ 19; Answer ¶ 19; Ex. 6, Decl. of Liz Blaylock ("Blaylock Decl."), ECF No. 47-3, at 50 (Mine Shaft incorporated in 2013).

[5] Compl. ¶ 19; Answer ¶ 19.

[6] Compl. ¶¶ 19, 24; Answer ¶¶ 19, 24.

[7] Compl. ¶¶ 60, 72; Answer ¶¶ 60, 72; Blaylock Decl. ¶ 16 & Ex. 6. While Mr. Whittington asserts he "lacks knowledge or information" as to whether Mine Shaft registered any security interest with the SEC, he offers no contrary evidence or testimony. Answer ¶ 72. "In conducting its analysis, a court need only consider the grounds *actually stated* by a party as reasons for concluding that another party's assertion of fact is disputed." *Butler v. Daimler Trucks N. Am., LLC*, 74 F.4th 1131, 1151 (10th Cir. 2023) (citing *Pasternak v. Lear Petroleum Expl., Inc.*, 790 F.2d 828, 834 (10th Cir. 1986)).

[8] Compl. ¶ 20; Answer ¶ 20.

[9] Compl. ¶ 20; Answer ¶ 20; Decl. of Christian C. Perry ("Perry Decl.") ¶ 3, ECF No. 47-8, & Ex. 3, ECF No. 47-8, at 116–17.

[10] Compl. ¶ 20; Answer ¶ 20; Blaylock Decl. ¶ 9 & Ex. 1, ECF No. 47-2, at 16–19. Mr. Whittington argues Ms. Blaylock's testimony is inadmissible expert testimony under Federal Rule of Evidence 702. Mem. Opposing Mot. for Summ. J. ("Opp'n") 5, ¶ 9, ECF No. 59, filed June 1, 2023 (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 389–90 (1993)). To the extent Mr. Whittington moves to exclude Ms. Blaylock's testimony, the court will disregard a motion lodged within a response. Such a "motion must be separately filed." DUCivR 7-1(a)(3) ("A party may not make a motion . . . in a response or reply."). In any event, the Commission does not tender Ms. Blaylock's findings as expert testimony. *See* Reply 10 n.4. Ms. Blaylock offers factual findings from her investigation—not "legal and accounting conclusions." Opp'n 5, ¶ 9; *see* Blaylock Decl. ¶ 4 ("The *facts* set forth in this declaration are based upon the results of an investigation during which Division investigators collected information, performed analyses and reviewed documents, communications, bank statements and other records concerning Mine Shaft . . . and related entities and individuals, including [Mr.] Nemeckay . . . and [Mr.] Whittington." (emphasis added)). The court thus considers Ms. Blaylock's testimony for purposes of the instant motion. *See, e.g.*, *United States v. Tao*, No. 19-20052, 2022 WL 252019, at *12 (D. Kan. Jan. 27, 2022) (accountants' testimony about bank and other financial records did not implicate Rule 702); *cf. In re Rich Glob., LLC*, No. 16-cv-00217, 2018 WL 11536422, at *4 (D. Wyo. Nov. 30, 2018) (accountant tendered as an expert to provide valuation and solvency analyses).

2013.[11] Mr. Nemeckay signed a Stipulation and Consent Order.[12] Accordingly, the Division

fined him $350,000 and barred him "from associating with a broker-dealer or investment advisor

licensed in Utah, acting as an agent for any issuer soliciting investor funds in Utah, [or]

becoming licensed in any capacity in the securities industry of Utah."[13] In July 2016, the

Commission sanctioned Mr. Nemeckay for violating Utah securities laws because he "ma[de]

untrue statements of material facts" and "transact[ed] business in the state of Utah as an

unlicensed agent."[14] The Commission barred Mr. Nemeckay "from association with any broker,

dealer, investment adviser, municipal securities dealer, municipal advisor, [or] transfer agent"

and from "participating in any offering of a penny stock."[15]

*Mine Shaft's Founder for Key Accounts/Business Development, Mr. Whittington*

Mr. Whittington is Mine Shaft's senior vice president of business development and

appears on marketing materials as a founding member for key account/business development.[16]

Mine Shaft's Form D[17] filed with the Commission lists Mr. Whittington as an executive officer.[18]

---

[11] Compl. ¶ 20; Answer ¶ 20; Blaylock Decl. ¶ 9 & Ex. 1; Ex. 2, ECF No. 47-2, at 2, ¶ 4.

[12] Compl. ¶ 20; Answer ¶ 20; Blaylock Decl. ¶ 10 & Ex. 2.

[13] Mot. for Summ. J. 4, ¶ 5; Compl. ¶ 20; Answer ¶ 20; Blaylock Decl. ¶ 10 & Ex. 2, ¶¶ 128–29.

[14] Compl. ¶ 20; Answer ¶ 20; Blaylock Decl. ¶ 19 & Ex. 10.

[15] Compl. ¶ 20; Answer ¶ 20; Blaylock Decl. ¶ 19 & Ex. 10, ECF No. 47-4, at 3.

[16] Compl. ¶ 22; Answer ¶ 22; Perry Decl. ¶ 4 & Ex. 1, at 12; Ex. 3, ECF No. 47-8, at 70–71, 116, 118; Ex. 4, ECF No. 47-8, at 138–39; Decl. of Scott Bowen ("Bowen Decl.") ¶¶ 3–4, ECF No. 47-9, & Ex. 1, at 7; Ex. 3, ECF No. 47-9, at 161, 163.

[17] "Regulation D is a series of rules that govern commonly used regulatory exemptions that companies can use to sell securities. Regulation D requires that companies file a notice of their offering with the SEC using Form D." *What Is a Form D and How Do I File It?*, U.S. Sec. & Exch. Comm'n (June 23, 2023), https://www.sec.gov/education/capitalraising/building-blocks/formd.

[18] Compl. ¶ 22; Answer ¶ 22; Blaylock Decl. ¶ 16 & Ex. 6, at 51. In his affidavit, Mr. Whittington claims he was never a board member or executive officer. Decl. of Charlie Whittington ("Whittington Decl.") ¶¶ 13–14, ECF No. 60. But his denial does not create a genuine dispute of material fact given Mr. Whittington's prior admission, the declarations, and marketing materials cited herein. In fact, he admitted in his Answer that Mine Shaft marketing materials listed him as a founding member and senior vice president of business development. Answer ¶ 22. Mr. Whittington cannot simply contradict his prior judicial admission with a general denial, particularly when overwhelming evidence supports the admission. *Underberg v. United States*, 362 F. Supp. 2d 1278, 1283 (D.N.M. 2005) ("An admission under Fed. R. Civ. P. 36(b) is deemed conclusively established (unless the [c]ourt permits it

He never received a license to work in the securities industry,[19] never registered as a broker,[20] and never associated with any entities registered as brokers.[21] From 2013 through at least 2019, he contacted potential investors about Mine Shaft securities.[22]

*Solicitation of Mine Shaft Investors*

In October 2013, Mr. Whittington emailed a friend about investing in Mine Shaft at the "ground level."[23] The email forwarded a message from Mr. Nemeckay seeking "A round investors" for a five-to-ten-thousand dollar investment.[24] In return, investors would receive a convertible note that matured in one year at eight percent and the investor could convert their contributions into preferred stock at a discount.[25] Mr. Whittington assured the friend that his "money could be withdrawn . . . at any time."[26] He continued to pitch Mine Shaft over the next three years.[27] For instance, he sent the friend slides explaining several advantages of a Mine

---

to be withdrawn or amended) and 'cannot be overcome at the summary judgment stage by contradictory affidavit testimony or other evidence in the summary judgment record.'" (quoting *In re Carney*, 258 F.3d 415, 420 (5th Cir. 2001))); *see Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986) ("[T]he utility of summary judgment as a procedure for screening out sham fact issues would be greatly undermined if a party could create an issue of fact merely by submitting an affidavit contradicting his own prior testimony.").

[19] Compl. ¶ 22; Answer ¶ 22.

[20] Compl. ¶ 26; Answer ¶ 26.

[21] Compl. ¶ 74; Answer ¶ 74.

[22] Mr. Whittington claims that he has "never been involved with any company that was trying to raise money[.]" Whittington Decl. ¶ 5. But the weight of evidence cuts against his claim. *See* Perry Decl.; Bowen Decl.; Decl. of Mike Carr ("Carr Decl."), ECF No. 47-14 (discussing Mr. Whittington's interactions with potential investors concerning Mine Shaft securities). What is more, Mr. Whittington admits in his declaration that he "passed along [his] general belief that [Mine Shaft] was a good idea that might prove to be a good investment opportunity[.]" Whittington Decl. ¶ 6. As such, there is no genuine factual dispute that he was closely involved in soliciting investors for Mine Shaft.

[23] Perry Decl. ¶ 3 & Ex. 1, at 7. The friend has known Mr. Whittington for over twenty years. Perry Decl. ¶ 2.

[24] Ex. 1, Perry Decl., ECF No. 47-8, at 7–8.

[25] *Id.*

[26] Perry Decl. ¶ 5.

[27] *Id.* at ¶ 4 ("[S]hares in Mine Shaft . . . were 'going fast,' and . . . ground breaking on the building would occur soon."); Ex. 2, ECF No. 47-8, at 68 ("[T]ake a look at this information. Give me a call if you have any questions."); Ex. 4, ECF No. 47-8, at 138 ("In a nut shell, $50,000 investment would get you back a little over $1,200,000 with those numbers[.] Not a bad return."); Ex. 6, ECF No. 47-8, at 147 (offering a trip to attend the 2016 Masters at Augusta National Golf Club, Mr. Whittington said, "You need to take advantage of this"). Given these statements,

Shaft investment: investors in "A Round" would get eight percent annual preferred interest; invested funds would go to developing the brewery and restaurant; and seventy percent of investment funds would support equipment, buildings, and inventory.[28] In April 2016, the friend invested $10,000 and received Mine Shaft securities.[29] When the friend later asked Mine Shaft to return his investment, Mr. Nemeckay said he would ask other investors to buy the friend's securities "at a discount."[30] The friend complained to Mr. Whittington who responded: "We are going to do what [w]e can to help. I am working on this, I'll do my best to make it happen. . . . It will take a little time so be patient with me."[31]

Two years later, Mr. Whittington solicited a surgeon over email about Mine Shaft investments.[32] He connected the surgeon with Mr. Nemeckay, who then sent an operating agreement, a subscription agreement for Series A interests, and an investor slide deck.[33] The surgeon invested $100,000 in Mine Shaft.[34]

In April 2019, Mr. Nemeckay solicited another prospect to invest in Mine Shaft.[35] The two corresponded over email and phone throughout the year.[36] Mr. Nemeckay sent the prospect an investor slide deck, a private placement memorandum, an operating agreement, and a term

---

Mr. Whittington's unsupported claim he "never proffered advice or valuation" does not raise a genuine dispute. Whittington Decl. ¶ 16.
[28] Ex. 3, Perry Decl., ECF No. 47-8, at 70 ("Here is our most updated investment deck, any help will be greatly appreciated."); *see id.* at 73–136.
[29] Perry Decl. ¶¶ 10–11 & Ex. 7, at 151–53; Ex. 9, ECF No. 47-8, at 162–64.
[30] Ex. 11, Perry Decl., ECF No. 47-8, at 174.
[31] *Id.* at 172.
[32] Perry Decl. ¶ 3.
[33] Ex. 2, Perry Decl., ECF No. 47-9, at 9 (email), 15–63 (operating agreement), 65–97 (Series A membership interests); Ex. 3, ECF No. 47-9, at 118–81 (slide deck).
[34] Perry Decl. ¶ 10 & Ex. 4.
[35] Carr Decl. ¶ 2.
[36] *Id.* at ¶ 4.

sheet for promissory notes.[37] The term sheet promised that the investment would mature in five

years at eight percent interest and the investor would have the option to convert the note into

Series A interests at a discount.[38] In October 2019, the prospect spoke with Mr. Nemeckay and

Mr. Whittington on the phone so that the two could discuss the "investment opportunity."[39] The

prospect invested $10,000.[40]

In total, at least 107 individuals invested in Mine Shaft for approximately $2.7 million.[41]

Mine Shaft spent about $550,000 of the investor funds on business-related expenses.[42] The

remaining funds went to Mr. Nemeckay's personal bank account, to Mine Shaft investors for

repayment, and to the other two Mine Shaft executive officers: Mr. Whittington and John A.

Logan ("Mr. Logan").[43] Mr. Whittington was paid $255,053.68 from investor funds.[44] After one

investor contributed just over $50,000, Mr. Whittington received two percent of the investment.[45]

The Mine Shaft Form Ds did not report any sales commissions or salaries.[46]

---

[37] Id.; Ex. 1, Carr Decl. (slide deck); Ex. 2 (slide deck); Ex. 3 (private placement memorandum); Ex. 4 (operating agreement and promissory note).
[38] Ex. 4, Carr Decl., ECF No. 47-16, at 100.
[39] Carr Decl. ¶ 8.
[40] Id. at ¶ 9.
[41] Blaylock Decl. ¶ 28.
[42] Id. at ¶ 32.
[43] Id. at ¶¶ 30–31; Exs. 6–7, Blaylock Decl.
[44] Blaylock Decl. ¶ 30(d). Mr. Whittington avers he received only "reimbursement and other payment from [Mine Shaft] . . . related to charges incurred . . . at Mr. Nemeckay's direction." Whittington Decl. ¶ 17. Yet he admits he received other payments "not related to expenses." Id. Two specific reimbursements were for a membership at a country club and for tickets to a golf tournament. Id.
[45] Blaylock Decl. ¶ 37.
[46] Exs. 6–7, Blaylock Decl.; Whittington Decl. ¶ 16.

*Procedural Posture*

The Commission filed its Complaint against Mine Shaft, Mr. Nemeckay, Mr. Whittington, and Mr. Logan on July 27, 2021.[47] The Commission alleges four causes of action against Mr. Whittington. At issue here are alleged violations of Sections 5(a) and 5(c) of the Securities Act and Section 15(a)(1) of the Exchange Act.[48] In May 2022, Mr. Whittington moved to dismiss the Complaint or to stay proceedings pending the outcome of Mr. Nemeckay's criminal case.[49] The court denied the motion in July 2022.[50] The Commission filed its partial summary judgment motion against Mr. Whittington on March 21, 2023.[51] Mr. Whittington filed his opposition on June 1, 2023.[52] Two weeks later, the Commission replied.[53]

## STANDARD

Summary judgment is proper under Federal Rule of Civil Procedure 56(a) "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[54] "[T]he 'mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.'"[55] "To determine whether a

---

[47] *See* Compl. On February 18, 2022, the Clerk of Court entered default as to Mine Shaft and Mr. Nemeckay. ECF No. 24. On January 24, 2023, the court granted the Commission's motion for entry of consent judgment as to Mr. Logan. ECF No. 46.

[48] Compl. ¶¶ 78–81, 87–89.

[49] ECF No. 33.

[50] ECF No. 36.

[51] *See* Mot. Summ. J.

[52] *See* Opp'n.

[53] Reply in Support of Mot. for Summ. J. ("Reply"), ECF No. 61.

[54] Fed. R. Civ. P. 56(a).

[55] *Klein v. Roe*, 76 F.4th 1020, 1028 (10th Cir. 2023) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)); *see N.M. Oncology & Hematology Consultants, Ltd. v. Presbyterian Healthcare Servs.*, 994 F.3d 1166, 1171–72 (10th Cir. 2021) ("To survive a motion for summary judgment, the nonmoving party must show more than '[t]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position . . . there must be evidence on which the jury could reasonably find for the [nonmoving party].'" (alterations in original) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986))).

'genuine issue' as to a material fact exists, [the court] consider[s] 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"[56] "Mere allegations unsupported by further evidence . . . are insufficient to survive . . . summary judgment."[57] "The movant bears the initial burden of demonstrating the absence of a genuine issue of material fact, but once the moving party has done so, the burden shifts to the non-movant to establish a genuine issue of fact."[58] The court "view[s] the evidence and draw[s] all reasonable inferences in favor of the nonmoving party."[59]

## DISCUSSION

The Commission seeks summary judgment on two causes of action. First, it alleges Mr. Whittington violated Sections 5(a) and 5(c) of the Securities Act for offering the sale of unregistered securities through interstate commerce.[60] Second, it alleges Mr. Whittington violated Section 15(a)(1) of the Exchange Act by doing so as an unregistered broker or dealer.[61] The court addresses each allegation in order.

I.   **The Commission Is Entitled to Summary Judgment on Mr. Whittington's Alleged Violations of Sections 5(a) and 5(c) of the Securities Act.**

The Securities Act "requires a company to register the securities it intends to offer to the public with the [Commission]."[62] Under Section 5, it is unlawful for a person to use any means or instruments of communications or transportation to sell or deliver unregistered securities in

---

[56] *Klein*, 76 F.4th at 1028 (quoting *Anderson*, 477 U.S. at 252). Relevant evidence includes "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits[.]" *Baca v. Sklar*, 398 F.3d 1210, 1216 (10th Cir. 2005) (citing Fed. R. Civ. P. 56(c)).
[57] *James v. Wadas*, 724 F.3d 1312, 1319–20 (10th Cir. 2013) (citation omitted).
[58] *Georgelas v. Desert Hill Ventures, Inc.*, 45 F.4th 1193, 1197 (10th Cir. 2022) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).
[59] *Butler*, 74 F.4th at 1140.
[60] Compl. ¶¶ 78–81 (Count I).
[61] *Id.* at ¶¶ 87–89 (Count IV).
[62] *Slack Techs., LLC v. Pirani*, 143 S. Ct. 1433, 1437 (2023).

interstate commerce.[63] Likewise, it is unlawful for a person to sell or offer to buy any securities through interstate commerce unless that person files a registration statement.[64]

To make a prima facie case, a plaintiff must show "(1) no registration statement was in effect as to the securities, (2) the defendant sold or offered to sell these securities, and (3) interstate transportation or communication and the mails were used in connection with the sale or offer of sale."[65] The plaintiff need not prove scienter.[66] "Once a plaintiff makes out a prima facie case that the securities offered or sold were not registered, the defendant bears the burden of demonstrating its entitlement to an exemption."[67] The court construes exemptions narrowly.[68] Before addressing the three elements, the court examines if the interests Mr. Whittington purportedly offered or sold were "securities."

### A.   No Genuine Dispute of Material Fact Exists That the Mine Shaft Interests Were "Securities."

The Commission argues Mine Shaft interests constituted securities.[69] Mr. Whittington makes no argument in response.[70] "[T]he ultimate question of whether an instrument is a security

---

[63] 15 U.S.C. § 77e(a).

[64] *Id.* § 77e(c).

[65] *SEC v. GenAudio Inc.*, 32 F.4th 902, 939 (10th Cir. 2022) (quoting *SEC v. Levin*, 849 F.3d 995, 1001 (11th Cir. 2017)).

[66] *SEC v. Calvo*, 378 F.3d 1211, 1215 (11th Cir. 2004) (collecting cases); *see SEC v. Schooler*, 905 F.3d 1107, 1115 (9th Cir. 2018) ("Section 5 is a strict liability statute[.]" (citation omitted)); *Swenson v. Engelstad*, 626 F.2d 421, 424 (5th Cir. 1980); *SEC v. Universal Major Indus. Corp.*, 546 F.2d 1044, 1047 (2d Cir. 1976).

[67] *Busch v. Carpenter*, 827 F.2d 653, 656 (10th Cir. 1987); *see SEC v. Ralston Purina Co.*, 346 U.S. 119, 126 (1953); *GenAudio*, 32 F.4th at 939 ("At trial, the 'burden of proof is clearly upon' those litigants 'claiming [the exemption's] benefit, as public policy strongly supports registration.'" (alteration in original) (quoting *Quinn & Co. v. SEC*, 452 F.2d 943, 945–46 (10th Cir. 1971), *cert. denied*, 406 U.S. 957 (1972))).

[68] *Busch*, 827 F.2d at 656 (citing *SEC v. Murphy*, 626 F.2d 633, 641 (9th Cir. 1980)).

[69] *See* Mot. for Summ. J. 11–13.

[70] "The [c]ourt generally considers unaddressed arguments or motions to be unopposed." *Hylton v. Bd. of Cnty. Comm'rs for Cnty. of Doña Ana*, No. 2:19-cv-01155, 2021 WL 1128051, at *2 (D.N.M. Mar. 24, 2021); *see Bella Monte Owners Ass'n, Inc. v. Vial Fotheringham, LLP*, No. 2:19-cv-00212, 2021 WL 5961566, at *7 (D. Utah Dec. 16, 2021) ("If a party fails to make an argument in opposition to a motion for summary judgment, that argument is waived."); *accord Pennington v. Northrop Grumman Space & Mission Sys. Corp.*, 269 F. App'x 812, 820 (10th Cir. 2008) (not selected for publication).

is 'a question of law and not of fact[.]'"[71] The Securities Act applies to a "[1] scheme involv[ing] an investment of money [2] in a common enterprise [3] with profits to come solely from the efforts of others."[72]

The court finds no dispute of material fact that the Mine Shaft interests allegedly sold or offered were "securities." First, the evidence shows several investors paid considerable sums by wire and check for Mine Shaft interests.[73] Next, the investments implicated a common enterprise. Promoters marketed Mine Shaft as "an opportunity to contribute money and to share in the profits of a large [brewery] enterprise . . . ."[74] The private placement memorandum shown to potential investors described Mine Shaft's need to sell membership interests "to accelerate the Company's growth . . . to become the fastest growing brewery by 2016 and a nationally-recognized leader within five years."[75] Indeed, the memorandum remarked that "the funds raised from this offering of the Series A Interests . . . will enable [Mine Shaft] to quickly move down the path."[76] After buying into Mine Shaft, investors would receive a fixed annual return or an option to convert their interests into preferred stock.[77]

Last, the third element is satisfied because any investment return would not have resulted from investors' efforts. "[T]he test is 'whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or

---

[71] *SEC v. Thompson*, 732 F.3d 1151, 1161 (10th Cir. 2013) (quoting *Ahrens v. Am.-Can. Beaver Co.*, 428 F.2d 926, 928 (10th Cir. 1970)).

[72] *SEC v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946); *see Klein*, 76 F.4th at 1035.

[73] Blaylock Decl. ¶¶ 28, 30; Perry Decl. ¶¶ 10–11 & Exs. 7–9; Bowen Decl. ¶¶ 10–11 & Exs. 2, 4; Decl. of Bruce Nunnally ("Nunnally Decl.") ¶ 9, ECF No. 47-10, filed Mar. 21, 2023, & Exs. 4, 6; Decl. of Anthony Cesaris ("Cesaris Decl.") ¶ 6, ECF No. 47-12, & Ex. 4; Carr Decl. ¶ 9 & Ex. 4.

[74] *Klein*, 76 F.4th at 1035 (quoting *Howey*, 328 U.S. at 299).

[75] Ex. 2C, Bowen Decl., ECF No. 47-9, at 71.

[76] *Id.*

[77] *E.g.*, Ex. 1, Perry Decl.; Ex. 2, Bowen Decl.

success of the enterprise.'"[78] "[A]ccess to information about the investment, and not managerial control, is the most significant factor."[79] Here, the undisputed facts show Mine Shaft's "team of pioneers and master brewers" and "Experienced Management Team"[80]—not investors—would further the enterprise. What is more, investors did not have "the type of control reserved under the agreements to obtain access to information necessary to protect, manage, and control their investments at the time they purchased their interests."[81] Investors relied on Mr. Nemeckay's and Mr. Whittington's updates, mainly over email, for relevant information.[82]

For these reasons, there is no genuine dispute that the Mine Shaft interests qualified as securities. The court next determines if the Commission establishes a prima facie case for Mr. Whittington's alleged violations of Sections 5(a) and 5(c) of the Securities Act.

### B.   There Is No Genuine Dispute of Material Fact That Mr. Whittington Used Means or Instrumentalities of Interstate Commerce and That No Registration Statement Was Filed for the Sale of Mine Shaft Interests.

For Section 5's first and third elements, the Commission must demonstrate that the defendant used interstate transportation or communication to sell or offer to sell securities and that there was no registration statement.[83] Neither element is in dispute. The uncontested facts show Mr. Whittington used email and phone to solicit potential investors.[84] Both the internet[85]

---

[78] *SEC v. Shields*, 744 F.3d 633, 645 (10th Cir. 2014) (alteration in original) (quoting *Crowley v. Montgomery Ward & Co.*, 570 F.2d 875, 877 (10th Cir. 1975)).

[79] *Maritan v. Birmingham Props.*, 875 F.2d 1451, 1457 (10th Cir. 1989) (quoting *Matek v. Murat*, 862 F.2d 720, 728 (9th Cir. 1988), *abrogated on other grounds by Schooler*, 905 F.3d 1107).

[80] Ex. 3, Bowen Decl., ECF No. 47-9, at 123, 158.

[81] *Shields*, 744 F.3d at 645.

[82] *See* Perry Decl. ¶¶ 7, 11–12; Bowen Decl. ¶¶ 7, 11–12; Nunnally Decl. ¶ 11; DeCesaris Decl. ¶¶ 9–10.

[83] *GenAudio*, 32 F.4th at 939.

[84] *See* Perry Decl. ¶¶ 3–4; Exs. 1–4, 6, Bowen Decl.; Bowen Decl. ¶¶ 3–4 & Exs. 1–2; Carr Decl. ¶ 8.

[85] *See Utah Lighthouse Ministry v. Found. for Apologetic Info. & Rsch.*, 527 F.3d 1045, 1054 (10th Cir. 2008) ("[T]he Internet is generally an instrumentality of interstate commerce[.]").

and telephones[86] are instrumentalities of interstate commerce. And it is undisputed that no registration statement existed for the sale of Mine Shaft's membership interests.[87] As Mine Shaft informed potential investors, "the securities . . . have not been registered under the Securities Act of 1933[.]"[88] Mr. Whittington provides no evidence to the contrary.

   ### C.   There Is No Genuine Dispute of Material Fact That Mr. Whittington Was a Necessary Participant in the Offering of Mine Shaft Securities.

   At issue is whether Mr. Whittington sold or offered to sell Mine Shaft securities. The Commission contends Mr. Whittington at minimum participated in the offer and sale of securities.[89] It describes Mr. Whittington as the "but-for" cause and "necessary participant" in the investments.[90] For his part, Mr. Whittington contends he was a mere "finder" and he "never engaged in the business of effecting transactions in securities."[91]

   Section 5 liability extends beyond one who is a direct seller. "To demonstrate that a defendant sold securities, the [Commission] must prove [only] that the defendant was a 'necessary participant' or 'substantial factor' in the illicit sale."[92] "Sellers of securities include persons who solicit purchases and who are 'motivated at least in part by a desire to serve [their]

---

[86] *See United States v. Morgan*, 748 F.3d 1024, 1033 n.11 (10th Cir. 2014) ("[T]elephones are instrumentalities of interstate commerce.").
[87] Blaylock Decl. ¶¶ 16–17 & Exs. 6–7.
[88] Bowen Decl. ¶ 3 & Ex. 2B, ECF No. 47-9, at 1 (capitalization removed); *see also* Ex. 2C, Bowen Decl., ECF No. 47-9, at 67 ("The Series A Interests have not been registered . . . and no such registration is contemplated.").
[89] Mot. for Summ. J. 15.
[90] Reply 3–4.
[91] Opp'n 10.
[92] *Calvo*, 378 F.3d at 1215 (citing *SEC v. Holschuh*, 694 F.2d 130, 139–40 (7th Cir. 1982); *Murphy*, 626 F.2d at 649–52); *see SEC v. Phan*, 500 F.3d 895, 906 (9th Cir. 2007).

own financial interests.'"[93] A person does not "have to be involved in the final step of the distribution to have participated in it."[94]

The facts reveal Mr. Whittington was a substantial factor in the sale of securities. Mine Shaft touted him as a "Key Accounts/Business Development Advisor"[95] and an Executive Officer,[96] and described him as serving in a "sales management role[]."[97] Mr. Whittington communicated with potential investors as "Founder[,] Business Development."[98] He made initial contact with at least two investors.[99] Through email and telephone conversations, Mr. Whittington sent the investors investment documents and made numerous representations about Mine Shaft.[100] The two investors declared they invested money "[b]ased on the representations made by Whittington[.]"[101] It is irrelevant that Mr. Whittington does not "believe that any potential investor relied upon [his] opinions."[102] The undisputed facts show Mr. Whittington was a major factor in investors' decisions to purchase Mine Shaft securities, regardless of his beliefs. For this reason, the Commission establishes a prima facie case for a Section 5 violation.

---

[93] *SEC v. Parrish*, No. 11-cv-00558, 2012 WL 4378114, at *4 (D. Colo. Sept. 25, 2012) (quoting *Pinter v. Dahl*, 486 U.S. 622, 647 (1988)); *see id.* ("The use of intermediaries between the seller and purchaser does not limit liability." (citing *SEC v. Wolfson*, 539 F.3d 1249, 1261, n. 19 (10th Cir. 2008))).

[94] *Geiger v. SEC*, 363 F.3d 481, 487 (D.C. Cir. 2004); *see Ackerberg v. Johnson*, 892 F.2d 1328, 1335 (8th Cir. 1989) ("The congressional intent . . . was to cover all persons who might operate as conduits for the transfer of securities to the public.").

[95] Ex. 2C, Bowen Decl., ECF No. 47-9, at 75; Ex. 3, Perry Decl., ECF No. 47-8, at 116, 118.

[96] Ex. 6, Blaylock Decl., ECF No. 47-3, at 51; Ex. 7, Blaylock Decl., ECF No. 47-3, at 57.

[97] Ex. 3, Bowen Decl., ECF No. 47-9, at 163.

[98] *E.g.*, Ex. 3, Perry Decl., ECF No. 47-8, at 71.

[99] Perry Decl. ¶ 3 ("I received an e-mail from Whittington . . . soliciting me to invest in securities of Mine Shaft . . . ."); Bowen Decl. ¶ 3 ("I was contacted by Whittington via e-mail, who solicited me to invest in securities . . . of Mine Shaft . . . .").

[100] *See* Perry Decl. ¶ 4 & Ex. 3; Bowen Decl. ¶ 4.

[101] Perry Decl. ¶ 10 (investing $10,000); Bowen Decl. ¶ 10 (investing $100,000).

[102] Whittington Decl. ¶ 6.

### D.    Mr. Whittington Offers No Viable Exemption for His Section 5 Violations.

Having made out a prima facie case for violations of Section 5 of the Securities Act, the burden shifts to Mr. Whittington to offer a valid exemption.[103] The Commission contends Mr. Whittington does not plead any viable affirmative defense and offers no evidence to support a Rule 506 safe-harbor exemption.[104] Mr. Whittington argues the Commission bears the burden to disprove Mine Shaft acted with advice of counsel when it relied on the safe-harbor exemption.[105] According to Mr. Whittington, because the Commission has not deposed counsel for Mr. Nemeckay or Mine Shaft, the Commission "faces an insurmountable barrier to a finding that [Mine Shaft] violated these provisions."[106]

In effect, Mr. Whittington argues only one affirmative defense: that Mine Shaft acted on counsel's advice to rely on the Rule 506 safe-harbor exception. But one "may not rely on the advice of counsel to defend against a Section 5 claim."[107] "'Section 5 is a strict liability statute' so 'good faith reliance on counsel' cannot 'preclude liability under the statute.'"[108] Additionally, even construing Mr. Whittington's argument broadly, he offers no evidence for an exemption. Under Rule 506, "[o]ffers and sales of securities by an issuer that satisfy [certain] conditions . . . shall be deemed to be transactions not involving any public offering within the meaning of . . .

---

[103] *GenAudio*, 32 F.4th at 939 ("[E]xemptions to the rule . . . can be asserted as affirmative defenses.").

[104] *See* MSJ 17–18.

[105] Opp'n 11–12 (citing *Murphy*, 626 F.2d 633). Mr. Whittington argues the Commission "has not offered anything approaching reliable evidence in support of their contention that [Mine Shaft] was 'disqualified' for such exemption." *Id.* at 11.

[106] *Id.*

[107] *SEC v. Novus Techs., LLC*, No. 2:07-cv-00235, 2010 WL 4180550, at *13 (D. Utah Oct. 20, 2010), *aff'd sub nom. Thompson*, 732 F.3d 1151; *see SEC v. Friendly Power Co.*, 49 F. Supp. 2d 1363, 1368 (S.D. Fla. 1999) ("[N]either a good faith belief that the offers or sales in question were legal, nor reliance on the advice of counsel, provides a complete defense to a charge of violating Section 5 of the Securities Act." (citing *Holschuh*, 694 F.2d at 130)); *see also SEC v. Kahlon*, 141 F. Supp. 3d 675, 681 (E.D. Tex. 2015), *aff'd*, 873 F.3d 500 (5th Cir. 2017); *SEC v. Verdiramo*, 890 F. Supp. 2d 257, 271 (S.D.N.Y. 2011).

[108] *Schooler*, 905 F.3d at 1115 (quoting *SEC v. CMKM Diamonds, Inc.*, 729 F.3d 1248, 1256 n.6 (9th Cir. 2013)).

the [Securities] Act."[109] The "exemption permits the sale of unregistered securities to an unlimited number of *accredited* investors."[110] Here, Mr. Whittington makes no argument as to how Rule 506 applies. He simply declares he "was advised by Nemeckay that the company was in compliance with all legal requirements."[111] This is not enough.

Mr. Whittington instead tries to shift the burden of production to the Commission. To this end, he relies on a Ninth Circuit case for the proposition that the moving party must show "no genuine issue of material fact exists[.]"[112] Mr. Whittington's reliance is misplaced. The Ninth Circuit held that *if* a defendant met his "burden of proof in showing entitlement to an exemption[,]" *then* a plaintiff must show "there [is] no genuine issue of material fact as to [the defendant]'s affirmative defense or that . . . the [Commission] was clearly entitled to prevail as a matter of law."[113] Mr. Whittington offers no evidence or meaningful argument as to why he merits a Rule 506 exemption or any other exemption.[114] The court rejects his "tacit attempt to shift the burden of proof to the [Commission] as to [the] affirmative defense."[115] Indeed, the

---

[109] 17 C.F.R. § 230.506(a).
[110] *GenAudio*, 32 F.4th at 942 (citing §§ 230.502(b), 230.506).
[111] Whittington Decl. ¶ 11 (citation omitted).
[112] *Murphy*, 626 F.2d at 641.
[113] *Id.*
[114] *See, e.g.*, *GenAudio*, 32 F.4th at 943. Mr. Whittington admits he "has no access to the information that would reveal whether Rule 506 of Regulation D did or did not provide such safe harbor." Opp'n 11. His failure to pursue discovery does not shift the burden to the SEC. Even if Mr. Whittington did provide evidence supporting a safe-harbor exemption, the exemption would not apply. Rule 506(d) provides that "[n]o exemption . . . shall be available . . . if . . . [any] executive officer . . . [i]s subject to a final order of a state securities commission . . . [or] [i]s subject to an order of the Commission . . . that . . . [p]laces limitations on the activities, functions or operations of such person; or . . . [b]ars such person from being associated with any entity or from participating in the offering of any penny stock[.]" Mr. Nemeckay, an executive officer, *see* Exs. 6–7, Blaylock Decl., was subject to both a Utah Division of Securities final order and a Commission order, Blaylock Decl. ¶¶ 9–10, 19. As a result, Mr. Nemeckay was barred from "from associating with a broker-dealer . . . licensed in Utah, acting as an agent for any issuer soliciting investor funds in Utah, [or] becoming licensed in any capacity in the securities industry of Utah[,]" "barred from association with any broker, dealer, [or] investment adviser[,]" and barred from "participating in any offering of a penny stock." Exs. 1, 10, Blaylock Decl. This qualifies Mr. Nemeckay as a "bad actor" and Mr. Whittington could not therefore rely on a Rule 506 exemption.
[115] *GenAudio*, 32 F.4th at 943.

Tenth Circuit has made clear that nonmovants "must prove that [they] qualif[y] for the safe-harbor exemption; the [Commission] does not bear the burden of proving the contrary is true."[116]

In sum, there is no genuine dispute of material fact that the Commission meets its prima facie burden and Mr. Whittington produces no evidence to support an exemption. The court grants summary judgment to the Commission on Mr. Whittington's violation of Sections 5(a) and 5(c) of the Securities Act.

## II. The Commission Is Entitled to Summary Judgment on Mr. Whittington's Alleged Violation of Section 15(a)(1) of the Exchange Act.

Under the Exchange Act, it is "unlawful for any broker or dealer . . . to make use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security . . . unless such broker or dealer is registered . . . ."[117] "Scienter is not required to prove a violation of Section 15(a)."[118] A "broker" is one "engaged in the business of effecting transactions in securities for the account of others."[119]

---

[116] *Id.* (citing *Ralston Purina*, 346 U.S. at 126); *see Harper v. Del. Valley Broads., Inc.*, 743 F. Supp. 1076, 1090 (D. Del. 1990), *aff'd*, 932 F.2d 959 (3d Cir. 1991) ("Summary judgment will be entered 'against a party who failed to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" (quoting *Celotex*, 477 U.S. at 322))).

[117] 15 U.S.C. § 78*o*(a)(1).

[118] *SEC v. Merrill Scott & Assocs., Ltd.*, 505 F. Supp. 2d 1193, 1216 (D. Utah 2007); *see SEC v. RMR Asset Mgmt. Co.*, 553 F. Supp. 3d 820, 826 (S.D. Cal. 2021), *aff'd sub nom. SEC v. Murphy*, 50 F.4th 832 (9th Cir. 2022); *SEC v. CKB168 Holdings, Ltd.*, 210 F. Supp. 3d 421, 453 (E.D.N.Y. 2016); *George K. Baum Advisors, L.L.C. v. Sprint Spectrum, L.P.*, No. 11-2442, 2013 WL 5719506, at *20 (D. Kan. Oct. 21, 2013); *Parrish*, 2012 WL 4378114, at *4.

[119] 15 U.S.C. § 78c(a)(4)(A).

**A.    The *Hansen* Factors Support the Finding that Mr. Whittington Acted as a Broker.**

Courts consider the "totality of the circumstances" to determine if a person acts as a broker.[120] Six factors, first mentioned in *SEC v. Hansen*,[121] are typically examined:

> (i) whether the person works as an employee of the securities' issuer; (ii) whether he receives a commission rather than a salary; (iii) whether he sells or has sold the securities of another issuer; (iv) whether he participates in negotiations between the issuer and investor; (v) whether he provides advice or a valuation as to the merit of an investment; and (vi) whether he actively, rather than passively, finds investors.[122]

"Some courts have given particular weight to the factor of whether the person regularly participates in securities transactions at key points; others have deemed transaction-based compensation to be 'one of the hallmarks' of a broker."[123] "[A]ll factors need not be satisfied."[124] The court discusses the *Hansen* factors in order.

**1.    Mr. Whittington Acted as a Mine Shaft Employee.**

Mr. Whittington contends he was not a Mine Shaft employee.[125] The Commission argues that the undisputed evidence shows he acted as a broker "regardless of whether he was formally titled as an 'employee' of Mine Shaft."[126]

---

[120] *SEC v. Forester*, No. CV 20-9813, 2021 WL 4803475, at *3 (C.D. Cal. Sept. 17, 2021).

[121] No. 83 Civ. 3692, 1984 WL 2413 (S.D.N.Y. Apr. 6, 1984).

[122] *SEC v. Erwin*, No. 13-cv-03363, 2021 WL 3773649, at *11 (D. Colo. Aug. 25, 2021), *mot. for relief from j. denied*, 2021 WL 4307117 (D. Colo. Sept. 22, 2021), and *appeal dismissed sub nom. SEC v. Malouf*, No. 21-1327, 2021 WL 7543742 (10th Cir. Dec. 6, 2021); *see SEC v. Art Intellect, Inc.*, No. 2:11-cv-00357, 2013 WL 840048, at *20 (D. Utah Mar. 6, 2013) (citing *Hansen*, 1984 WL 2413, at *10); *see also SEC v. Hui Feng*, 935 F.3d 721, 731 (9th Cir. 2019) (collecting cases from the Sixth, Eighth, and Eleventh Circuits).

[123] *Sun River Energy, Inc. v. Nelson*, No. 11-cv-00198, 2013 WL 1222391, at *5 (D. Colo. Mar. 25, 2013) (quoting *SEC v. Kramer*, 778 F. Supp. 2d 1320, 1334 (M.D. Fla. 2011)).

[124] *Erwin*, 2021 WL 3773649, at *11 (citing *Hansen*, 1984 WL 2413, at *10–11).

[125] Whittington Decl. ¶¶ 10, 15–16.

[126] Reply 10.

Mine Shaft did not pay Mr. Whittington a fixed salary,[127] he did not participate in filing forms or registration documents, and he did not have access to Mine Shaft bank records.[128] But the undisputed evidence shows that he held himself out as a Mine Shaft employee.[129] The Form Ds listed Mr. Whittington as a Mine Shaft "Executive Officer."[130] Marketing materials identified him as a member of Mine Shaft's "Founding Team" responsible for "Key Accounts/Business Development."[131] When pitching Mine Shaft to prospects, he signed his emails with "Founder" and "Business Development."[132] He admits Mine Shaft marketing materials represented him as a senior vice president of business development.[133] And Mr. Nemeckay referred to Mr. Whittington as a "team member" in an email to a potential investor.[134] For these reasons, the first *Hansen* factor supports a finding that Mr. Whittington acted as a broker.

### 2. Mine Shaft Paid Mr. Whittington for Soliciting Investments.

Next, Mr. Whittington avers that Mine Shaft never paid him a commission.[135] The SEC contends Mine Shaft paid him with investor funds for his role in finding investors to purchase securities.[136] It argues the factor weighs against Mr. Whittington despite how he "personally characterizes th[e] payments."[137]

---

[127] *See* Exs. 6–7, Blaylock Decl.
[128] Whittington Decl. ¶¶ 9–10.
[129] *See, e.g.*, *Erwin*, 2021 WL 3773649, at *11 ("[I]t is undisputed that [the defendant] held himself out as Extreme Capital's Executive Vice President to both Financial Services and Condor."); *Art Intellect*, 2013 WL 840048, at *21 ("[Defendants] acted as broker-dealers when they solicited investors to purchase securities in the form of investment contracts.").
[130] Exs. 6–7, Blaylock Decl.
[131] Perry Decl. ¶ 4 & Ex. 1, ECF No. 47-8, at 12; Ex. 3, ECF No. 47-8, at 70–71, 116, 118; Ex. 4, ECF No. 47-8, at 138–39; Bowen Decl. ¶¶ 3–4 & Ex. 1, ECF No. 47-9, at 7; Ex. 3, ECF No. 47-9, at 161, 163.
[132] *See, e.g.*, Exs. 1, 3–4, Perry Decl.
[133] Compl. ¶ 22; Answer ¶ 22.
[134] Ex. 1, Perry Decl., ECF No. 47-8, at 9, 12 ("[Mr. Whittington] brings many years of outstanding . . . sales experience to [Mine Shaft].").
[135] Whittington Decl. ¶¶ 16–17.
[136] Reply 10.
[137] *Id.* at 11.

18

"Transaction-based compensation . . . [is] one of the hallmarks of being a broker-dealer."[138] "[M]any courts find incentive-based compensation to be particularly indicative of broker-type activities."[139] "The underlying concern has been that transaction-based compensation represents a potential incentive for abusive sales practices that registration is intended to regulate and prevent."[140] Here, the undisputed evidence shows Mine Shaft paid Mr. Whittington over $255,000 with investor funds.[141] On one occasion, two percent of an investor's contributions went directly to Mr. Whittington.[142] Though Mr. Whittington avers he received mere "reimbursements[,]" he admits Mine Shaft provided "other payment" that was only "in large part related" to credit card charges at Mr. Nemeckay's direction.[143] In addition, he declares that "[s]ome payments" were "not related to expenses."[144] And his two reimbursement examples dovetail with investor relations: golf and country club membership and tickets to a professional golf tournament.[145] Viewing the evidence in the light most favorable to Mr. Whittington, he solicited investors and Mine Shaft compensated him in return. As a result, the second *Hansen* factor weighs against Mr. Whittington.

---

[138] *Cornhusker Energy Lexington, LLC v. Prospect St. Ventures*, No. 8:04CV586, 2006 WL 2620985, at *6 (D. Neb. Sept. 12, 2006); *see Erwin*, 2021 WL 3773649, at *11; *Art Intellect*, 2013 WL 840048, at *20 ("Among the activities that indicate that a person may be a broker [is] . . . receipt of transaction-related compensation."); *accord EdgePoint Cap. Holdings, LLC v. Apothecare Pharmacy, LLC*, 6 F.4th 50, 57 n.5 (1st Cir. 2021).
[139] *Sun River Energy*, 2013 WL 1222391, at *5.
[140] *Cornhusker Energy*, 2006 WL 2620985, at *6.
[141] Blaylock Decl. ¶ 30.
[142] *Id.* at ¶ 37.
[143] Whittington Decl. ¶ 17.
[144] *Id.*
[145] *Id.*; *see* Ex. 6, Perry Decl. (exhorting a potential investor to "take advantage of this" when referring to a trip to the 2016 Masters for Mine Shaft investors).

### 3. Mr. Whittington Never Sold Securities of Another Issuer.

Mr. Whittington avers he has never sold securities of another issuer.[146] The Commission offers no evidence to the contrary. The third *Hansen* factor accordingly favors Mr. Whittington.

### 4. Mr. Whittington Participated in Negotiations for the Sale of Mine Shaft Securities.

As to the fourth factor, Mr. Whittington contends he had no role in negotiations or contracting. He avers he told potential investors he "would not be involved in the documents or negotiations"[147] and he claims he "had no role in drafting or filing the actual legal offerings."[148] In support, Mr. Whittington asserts investor correspondence "makes clear that [he] did nothing more than pass their interests in [Mine Shaft] onto Nemeckay who would thereafter handle all negotiations and contracts."[149] The Commission contends the opposite—that Mr. Whittington was "directly involved in negotiations" between Mine Shaft, Mr. Nemeckay, and investors.[150]

The undisputed evidence belies Mr. Whittington's claim. Two investors declared under oath that Mr. Whittington initiated contact, solicited them to purchase Mine Shaft securities, and made numerous representations about investing in Mine Shaft.[151] Even viewed most favorably to Mr. Whittington, the evidence shows he did not merely "pass [investors'] interest in [Mine Shaft] to Mr. Nemeckay."[152] On the contrary, he played a significant role. When one investor wanted to sell his investment, Mr. Whittington replied he was "working on [it]" and he would "do [his] best

---

[146] Whittington Decl. ¶ 5.
[147] *Id.* at ¶ 7.
[148] *Id.*
[149] Opp'n 14 (citing Exs. 1–2, Bowen Decl.; Ex. 1, Perry Decl.).
[150] Reply 11.
[151] *See* Perry Decl. ¶¶ 3–9 & Exs. 1–6; Bowen Decl. ¶¶ 3–9 & Exs. 1–3.
[152] Opp'n 14.

to make it happen."[153] Notably, Mr. Whittington explained to the dissatisfied investor that "[a]ll *we* try to do is facilitate the transaction as best *we* can."[154] And with Mr. Nemeckay, Mr. Whittington joined a pitch call to two investors.[155] The court therefore finds that the fourth *Hansen* factor favors the Commission.

### 5.    Mr. Whittington Provided Advice About Mine Shaft Investments.

Mr. Whittington asserts he never gave advice or a valuation of Mine Shaft investments.[156] He declares he "always made clear that [he] was not an expert or privy to any unique information."[157] In response, the Commission argues Mr. Whittington's own words and emails show he gave advice and a valuation.[158]

Having considered the evidence, the court finds no genuine dispute of fact that Mr. Whittington gave potential investors advice as to Mine Shaft securities. Mr. Whittington declares he "passed along [his] general belief that [Mine Shaft] was a good idea that might prove to be a good investment opportunity[.]"[159] It is of no moment that he says he did so "as a layman."[160] Investor declarations and Mr. Whittington's emails unmistakably show he provided advice. To one potential investor, he promised an "eight percent return on [an] investment" and said the investor's "money could be withdrawn . . . at any time."[161] He told the same prospect that a "$50,000 investment would get [him] back a little over $1,200,000[.] Not a bad return."[162] Mr.

---

[153] Ex. 11, Perry Decl.
[154] *Id.* (emphases added).
[155] Carr Decl. ¶ 8.
[156] Whittington Decl. ¶ 6.
[157] *Id.*
[158] Reply 12.
[159] Whittington Decl. ¶ 6.
[160] *Id.*
[161] Perry Decl. ¶¶ 4–5; *see* Bowen Decl. ¶ 4.
[162] Ex. 4, Perry Decl.

Whittington's representations to potential investors were precisely the type of advice that characterizes brokers.[163] For this reason, the fifth *Hansen* factor favors the Commission.

### 6.   Mr. Whittington Actively Solicited Investors for Mine Shaft.

Mr. Whittington contends he only "passively found investors."[164] Specifically, he avers he simply "passed along [his] general belief that [Mine Shaft] was a good idea that might prove to be a good investment opportunity."[165] The Commission contends the evidence paints a picture of active involvement: "marketing and selling the investment to prospective investors."[166]

Black's Law Dictionary defines "passive" as "[n]ot involving active participation[.]"[167] Even viewing the facts in a light most favorable to Mr. Whittington, he was indisputably an active participant in pitching Mine Shaft. Mr. Whittington states in his declaration that he "ma[d]e individuals generally aware of [Mine Shaft] and then suppl[ied] them with the contact information for those who would supply the relevant and required information."[168] But the record shows he did more. Indeed, even he avers Mr. Nemeckay thought he "could add value to the sales team" for Mine Shaft.[169] The marketing materials reflected that Mr. Whittington was a founder, member of the sales team, and associated with key accounts/business development.[170] He made unsolicited contact with at least two investors.[171] He pitched Mine Shaft through email and telephone to one investor over a three-year period and made several representations and

---

[163] *See, e.g.*, *SEC v. Armijo*, No. 21-cv-1107, 2023 WL 2436963, at *3, 12 (S.D. Cal. Mar. 8, 2023) (finding a defendant a broker when he told investors that funds were "good to go" and investors relied on his advice).
[164] Opp'n 14.
[165] Whittington Decl. ¶ 6.
[166] Reply 13.
[167] *Passive*, Black's Law Dictionary (11th ed. 2019).
[168] Whittington Decl. ¶ 7.
[169] *Id.* at ¶ 4.
[170] *E.g.*, Ex. 1, Perry Decl., ECF No. 47-8, at 12; Ex. 3, Perry Decl., ECF No. 47-8, at 116, 118.
[171] Perry Decl. ¶ 3 & Ex 1; Bowen Decl. ¶ 3 & Ex. 1.

offered advice.[172] When Mr. Whittington sent a slide deck to a potential investor, he stated, "any help will be greatly appreciated."[173] Later, Mr. Whittington joined Mr. Nemeckay to discuss an "investment opportunity[.]"[174] The sixth *Hansen* factor thus cuts against Mr. Whittington.

Overall, five *Hansen* factors support the fact that Mr. Whittington engaged in business as a broker. He acted as a Mine Shaft employee, received payments for soliciting investors, participated in negotiations between potential investors and Mine Shaft, gave advice about Mine Shaft investments, and actively sought out investors. For these reasons, the court finds no genuine dispute of material fact that Mr. Whittington acted as a broker.

### B.   The "Finder's Exception" Does Not Pertain to Mr. Whittington's Role with Mine Shaft.

Mr. Whittington contends he qualifies for a "finder's exception."[175] "[F]ederal securities laws do not specifically discuss a finder's exception and the phrase 'engaging in the business of effecting transactions in securities' is not defined in statute."[176] Courts have recognized this "limited, so-called 'finder's exception' that permits a person or entity to 'perform a narrow scope of activities without triggering the b[r]oker/dealer registration requirements.'"[177] But this exception is not an absolute defense. "[I]t just means that individuals can engage in 'a narrow scope of activities without triggering the broker/dealer registration requirements'—not that there is a 'finder defense' available to those who are otherwise 'brokers.'"[178] Put another way, this

---

[172] Perry Decl. ¶ 4 & Exs. 1–4, 6.
[173] Ex. 3, Perry Decl.
[174] Carr Decl. ¶ 8.
[175] Opp'n 12.
[176] *Salamon v. CirTran Corp.*, No. 2:03-cv-00787, 2005 WL 3132343, at *2 (D. Utah Nov. 22, 2005).
[177] *Kramer*, 778 F. Supp. 2d at 1336 (alteration in original) (internal quotation marks omitted) (quoting *Salamon v. Teleplus Enters., Inc.*, No. 05-2058, 2008 WL 2277094, at *8 (D.N.J. 2008)).
[178] *SEC v. Collyard*, 861 F.3d 760, 768 (8th Cir. 2017) (quoting *Kramer*, 778 F. Supp. 2d at 1336).

"exception reflects little more than an interpretation of the words 'effecting transactions,' that makes clear that those who 'collect commissions for purely "locating potential buyers or sellers, stimulating interest, and bringing parties together,"' are not in fact 'effecting transactions.'"[179]

Here, Mr. Whittington did not just bring parties together.[180] He regularly participated in the Mine Shaft enterprise over several years, personally solicited at least two investors, gave advice for Mine Shaft investments, served as Mine Shaft's key accounts and business development lead, distributed marketing material to potential investors, and received more than $255,000 from investor funds. Such are the actions of a broker—not a finder.

In short, the undisputed facts show Mr. Whittington operated as an unregistered broker.[181] And he used instrumentalities of interstate commerce to solicit investors to purchase Mine Shaft securities. As such, the court finds no genuine dispute of material fact. The Commission is entitled to judgment as a matter of law as to Mr. Whittington's violation of Section 15(a)(1) of the Exchange Act.

## ORDER

Accordingly, the court GRANTS Plaintiff's Motion for Summary Judgment.[182] The court grants Plaintiff summary judgment on Counts I and IV as to Defendant Charlie V. Whittington.

---

[179] *Rhee v. SHVMS, LLC*, No. 21-cv-4283, 2023 WL 3319532, at *8 (S.D.N.Y. May 8, 2023) (citations omitted).
[180] *See Finder*, Black's Law Dictionary (11th ed. 2019) ("A finder differs from a broker-dealer because the finder merely *brings two parties together* to make their own contract, while a broker-dealer usu[ally] participates in the negotiations." (emphasis added)); 5 Law Sec. Reg. § 14:56 (2023) (same); *Kramer*, 778 F. Supp. 2d at 1336 ("'Merely *bringing together the parties* to transactions, even those involving the purchase and sale of securities, is not enough' to warrant broker registration under Section 15(a)." (emphasis added) (quoting *Apex Global Partners, Inc. v. Kaye/Bassman Intern. Corp.*, No. 3:09-cv-637, 2009 WL 2777869, *3 (N.D. Tex. 2009))).
[181] *See* Whittington Decl. ¶ 5.
[182] ECF No. 47.

Signed September 21, 2023.

BY THE COURT

_____
David Barlow
United States District Judge