THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>MINE SHAFT BREWING LLC, a Delaware limited liability company; TIMOTHY A. NEMECKAY, an individual; and CHARLIE V. WHITTINGTON, an individual,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART [62] MOTION FOR DEFAULT JUDGMENTS**<br><br>Case No. 2:21-cv-00457-DBB-JCB<br><br>District Judge David Barlow |

Before the court is Plaintiff Securities and Exchange Commission's (the "SEC" or "Commission") Motion for Default Judgments.[1] The Commission moves for default judgment against Defendants Timothy A. Nemeckay ("Mr. Nemeckay") and Mine Shaft Brewing LLC ("Mine Shaft") (collectively "Defendants") for violations of the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act"). For the reasons below, the court grants the Commission's motion.[2]

---

[1] Mot. for Default J., ECF No. 62, filed Aug. 23, 2023.
[2] Having reviewed the briefings and relevant law, the court finds that oral argument would not materially assist in resolving the matter. *See* DUCivR 7-1(g).

## BACKGROUND[3]

Founded by Mr. Nemeckay, Mine Shaft is a member-managed LLC with Mr. Nemeckay as its only manager.[4] It is incorporated in Delaware with its principal place of business in Utah.[5] Mr. Nemeckay serves as Mine Shaft's president, secretary, and board manager.[6] Two other individuals serve as Mine Shaft executive officers[7]: John Allen Logan ("Mr. Logan")—Chief Financial Officer ("CFO") and a manager on the Board of Managers[8]—and Charles Vernon Whittington ("Mr. Whittington")—founding member and senior vice president of business development.[9] Mine Shaft originally planned to build a brewery and restaurant in Park City, Utah to market malt liquor, beer, and hard cider.[10] Later, Mine Shaft planned to operate in Santa Clarita, California and sell a line of hard seltzer beverages.[11] Defendants never filed a registration statement as to any Mine Shaft security offering.[12]

Mr. Nemeckay has never held a license in the securities industry.[13] In April 2014, the Utah Division of Securities (the "Division") filed a Notice of Agency Action and Order to Show Cause against Mr. Nemeckay.[14] The Division alleged Mr. Nemeckay had committed securities

---

[3] The court draws the background facts from the Complaint and the declaration of Utah securities investigator Liz Blaylock. *See Tripodi v. Welch*, 810 F.3d 761, 764 (10th Cir. 2016) ("After a default judgment is handed down, a defendant admits to a complaint's well-pleaded facts and forfeits his or her ability to contest those facts.").

[4] Compl. ¶¶ 19–20, ECF No. 2, filed July 27, 2021.

[5] *Id.* at ¶ 19.

[6] *Id.* at ¶ 20.

[7] *See* Decl. of Liz ("Blaylock Decl.") ¶¶ 16–17 & Exs. 6–7, ECF No. 47-2, filed Mar. 21, 2023.

[8] Compl. ¶ 21.

[9] *Id.* at ¶ 22. Mine Shaft's Form D filings listed Mr. Nemeckay, Mr. Logan, and Mr. Whittington as executive officers. "Regulation D is a series of rules that govern commonly used regulatory exemptions that companies can use to sell securities. Regulation D requires that companies file a notice of their offering with the SEC using Form D." *What Is a Form D and How Do I File It?*, U.S. Sec. & Exch. Comm'n (June 23, 2023), https://www.sec.gov/education/capitalraising/building-blocks/formd.

[10] Compl. ¶¶ 19, 24.

[11] *Id.* at ¶ 24.

[12] *Id.* at ¶¶ 60, 72.

[13] *Id.* at ¶ 20.

[14] *Id.*

fraud and various licensing and registration violations between 2011 and 2013.[15] Mr. Nemeckay subsequently signed a Stipulation and Consent Order.[16] The Division fined him $350,000 and barred him from associating with a broker-dealer and from becoming licensed.[17] In July 2016, the SEC sanctioned Mr. Nemeckay.[18] It barred him "from association with any broker, dealer, investment advisor, municipal securities dealer, municipal advisor, transfer agent, or national recognized statistical rating organization and [from] participating in any penny stock offering."[19]

Mr. Nemeckay, Mr. Logan, and Mr. Whittington (collectively the "Mine Shaft executives") started seeking buyers for Mine Shaft securities in 2013.[20] They offered prospective investors convertible promissory notes that promised 8% annual interest with an option to buy additional discounted interests.[21] The Mine Shaft executives approached investors directly, through referrals, over online investor platforms, or by way of general solicitation such as videos and press releases.[22] The Mine Shaft executives did not register with the SEC or associate with any entity registered with the SEC.[23] Mr. Nemeckay was heavily involved in the offer and sale of Mine Shaft securities, including issuing private placement memoranda ("PPM"), making representations to prospective investors, and sending newsletters to investors.

---

[15] Compl. ¶ 20.
[16] *Id.*
[17] *Id.*
[18] *Id.*
[19] *Id.*
[20] Compl. ¶ 23.
[21] *Id.* at ¶ 27.
[22] *Id.* at ¶¶ 27–28, 73.
[23] *Id.* at ¶ 26.

*Private Placement Memoranda*

Mr. Nemeckay had the final say on the PPMs' content and distribution.[24] Mine Shaft utilized at least seven PPMs promoting $400,000 in convertible promissory notes and $14,990,000 in Series A membership interests.[25] Each PPM identified Mr. Logan as Mine Shaft's CFO; the memoranda touted his experience as a certified public accountant, chief executive officer, and CFO.[26] Two memoranda—issued in 2015 and 2016—omitted the facts that Utah had barred Mr. Nemeckay in 2014 from associating with a broker-dealer or getting a license and had fined him $350,000.[27] One 2018 PPM omitted mention of the Commission's 2016 sanctions against Mr. Nemeckay.[28] Two later memoranda informed investors that:

> The Utah Division of Securities ordered Mr. Nemeckay in [2014] not to engage in broker[-]dealer, investment advisor and similar activities in Utah. In [2016], Mr. Nemeckay and the Securities and Exchange Commission entered into an agreement whereby Mr. Nemeckay agreed not to engage in broker-dealer, investment advisor and similar activities. These relate to assistance Mr. Nemeckay previously provided to a Utah-based company. *Mr. Nemeckay has provided information to the SEC regarding his involvement with Mine Shaft's fundraising efforts and the SEC has expressed no concern.* On November sixth [2017] Mr. Nemeckay received a request to vacate from the Commission for the above matter.[29]

Mr. Logan was not "overseeing and managing the financial affairs of Mine Shaft."[30] The SEC never approved the Mine Shaft offerings, never endorsed Mr. Nemeckay's involvement,

---

[24] *Id.* at ¶ 30.
[25] Compl. ¶ 31.
[26] *Id.* at ¶ 33(a).
[27] *Id.* at ¶ 33(b).
[28] *Id.* at ¶ 33(c).
[29] *Id.* at ¶ 33(e) (emphasis added).
[30] Compl. ¶ 33(a).

and never vacated its 2016 order.[31] And no PPM informed prospective investors how much Mine Shaft executives planned to earn from investors' contributions.[32]

*Representations to Prospective Investors*

Mr. Nemeckay sent several emails to potential investors. A June 11, 2018 email read: "[O]ur Mine Shaft Brewing docs have been inspected inside and out by the SEC and we / were [sic] given the green light to raise capital and make [Mine Shaft] successful."[33] Mr. Nemeckay also claimed that he and his attorney were SEC "whistleblowers."[34] But the SEC never reviewed Mine Shaft offerings or approved it to raise capital, and neither Mr. Nemeckay nor his attorney were whistleblowers to the SEC.[35]

Mine Shaft did not set a firm date for production; break ground on a restaurant or brewery; or brew, bottle, or manufacture any beverages for sale to the public.[36] Yet Mine Shaft executives told investors that returns would mature in 3–5 years after the brewery's launch and that Mine Shaft "was getting ready to move forward on production soon."[37] They told investors that "success was imminent" despite Mine Shaft's repeated failures to meet projections.[38] Responding to inquiries, Mine Shaft executives "advised investors on the merits of the[ir] investment[s]."[39]

---

[31] *Id.* at ¶ 36.
[32] *Id.* at ¶ 37.
[33] *Id.* at ¶ 41 (first two alterations in original).
[34] *Id.* at ¶ 43.
[35] Compl. ¶¶ 42–43.
[36] *Id.* at ¶ 48.
[37] *Id.* at ¶ 46.
[38] *Id.* at ¶ 47.
[39] *Id.* at ¶ 77.

*Investor Newsletters*

Starting in 2015, investors received updates in the form of newsletters. The July 2015 newsletter stated that Mine Shaft "ha[s] now secured investment commitments for just under $3M, and we have some key meetings scheduled with potentially significant investors. . . . [W]e have various developers courting [Mine Shaft]."[40] Mine Shaft touted the following benefits:

> Every Investor Receives Series A Preferred Shares Right of refusal on additional rounds 8% Annual Preferred Interest Mine Shaft Brewing's Black Card Club Membership offers exclusive access and opportunities like no other beer or wine clubs: • First access to limited production beers and ciders at the brewery. • Special opportunities to purchase exclusive releases. • Advance notice and special pricing on brewery events, including head brewer dinners. • Pre-sale all-access purchase opportunities for our Summer Concert Series and other events. • Discounts on dining and merchandise. • Dedicated Concierge Service to assist with purchases, event information, dinner reservations and information about our beers and ciders. • Exclusive opportunities for dinner along with game/event tickets with our athlete ambassadors: NHL, MLB, MLS, PGA, Olympic Medalist. This is exclusive access meant to create lifelong memories.[41]

The November 2019 newsletter stated that some investors "ha[d] been vocal to us in opposition to the move [from Park City to California]."[42] It went on to declare: "It is our understanding that one of [the investors] may have gone so far as to make a complaint to Utah state securities regulators, so please do not be alarmed if you receive communication in that regard. Despite its official nature there is no requirement that you respond."[43]

Ultimately, the Mine Shaft executives raised about $2.7 million from over 100 investors.[44] These investor funds represented Mine Shaft's only income source.[45] Mine Shaft

---

[40] Compl. ¶ 50 (first alteration in original).
[41] *Id.* at ¶ 51.
[42] *Id.* at ¶ 53 (second alteration in original).
[43] *Id.*
[44] *Id.* at ¶ 23.
[45] Compl. ¶ 64.

executives represented that over 70% of investor funds would support equipment, improvements, and inventory.[46]

*Use of Investor Funds*

Of the $2.7 million collected, Mine Shaft spent less than $550,000 on start-up costs such as marketing, travel, and legal fees.[47] Mine Shaft executives pocketed more than 62% of the proceeds.[48] Mr. Whittington received at least $255,000.[49] Mr. Logan got at least $22,600.[50] And Mr. Nemeckay transferred at least $1.7 million from Mine Shaft's bank account[51] to his and his wife's accounts.[52] He then used the funds for his personal use on expenses such as "mortgage, bills, utilities, food, shopping, and expenditures for personal or household use."[53] More than $312,000 went to pay restitution for Mr. Nemeckay's Utah securities violations.[54] Mine Shaft also used at least $277,000 to reimburse prior Mine Shaft note holders.[55] None of these disbursements were reflected in the Form Ds filed with the SEC.[56]

*Form Ds*

Mr. Nemeckay caused Mine Shaft to file Form Ds with the SEC in 2016 and 2019.[57] The 2016 Form D listed $0 as the "amount of the gross proceeds of the offering that has been or is

---

[46] *Id.* at ¶ 62.
[47] *Id.* at ¶ 63; Blaylock Decl. ¶ 32.
[48] Compl. ¶ 59.
[49] *Id.* at ¶ 65; Blaylock Decl. ¶ 30(d).
[50] Compl. ¶ 66; Blaylock Decl. ¶ 30(e).
[51] Mr. Nemeckay was the only signatory on Mine Shaft's bank account. Compl. ¶ 64.
[52] *Id.* at ¶ 67; Blaylock Decl. ¶ 31.
[53] Compl. ¶ 67; Blaylock Decl. ¶¶ 31, 34 ("Additional analysis of the $1,451,623 transferred from the Nemeckay Group Inc. to Nemeckay's personal checking account ending in 1224 reveals these funds were used entirely for personal expenses unrelated to Mine Shaft investment offering including, home mortgage, personal fitness, luxury vacations, credit card payments and shopping at retailers such as Louis Vuitton, Storm Cycle, Rossignol Ski, Tempur Pedic and others.").
[54] Compl. ¶ 69; Blaylock Decl. ¶ 31.
[55] Compl. ¶ 68; Blaylock Decl. ¶ 30(c).
[56] *See* Compl. ¶¶ 57–60; Blaylock Decl. ¶¶ 16–17 & Exs. 6–7.
[57] Compl. ¶ 56.

proposed to be used for payments to any of the persons required to be named as executive officers, directors, or promoters[.]"[58] On the 2019 Form D, the section "Use of Proceeds" had $360,000 as the "amount of the gross proceeds of the offering that has been or is proposed to be used for payments to any of the persons required to be named as executive officers, directors, or promoters[.]"[59] The same section contained the statement: "Approximately 20% of proceeds has been paid as consulting fees to such persons since 2015."[60] The forms claimed a Rule 506(b) exemption from SEC registration.[61]

*Procedural Posture*

On July 27, 2021, the SEC filed its Complaint against Mine Shaft, Mr. Nemeckay, Mr. Whittington, and Mr. Logan.[62] The SEC moved for entry of default against Mr. Nemeckay and Mine Shaft in January 2022.[63] The next month, the clerk of court entered corresponding default certificates.[64] In January 2023, the court granted the SEC's motion for entry of consent judgment as to Mr. Logan.[65] The SEC moved for partial summary judgment against Mr. Whittington two months later.[66] The court granted the motion, resolving two of the four claims against him.[67] On August 23, 2023, the SEC moved for default judgment as to Mr. Nemeckay and Mine Shaft.[68]

---

[58] *Id.* at ¶ 57; Blaylock Decl. ¶ 16 & Ex. 6.
[59] Compl. ¶ 58; Blaylock Decl. ¶ 17 & Ex. 7.
[60] Compl. ¶ 59; Blaylock Decl. ¶ 17 & Ex. 7.
[61] Compl. ¶ 71; Blaylock Decl. ¶¶ 16–17 & Exs. 6–7. "Under Rule 506(b), securities are exempt from registration if they are private offerings." *SEC v. Schooler*, 905 F.3d 1107, 1114 (9th Cir. 2018). "A security qualifies as a private offering if there are fewer than 35 non-accredited investors of securities in the offering, and each non-accredited investor has 'such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of the prospective investment.'" *Id.* (quoting 17 C.F.R. § 230.506(b)(2)).
[62] *See* Compl.
[63] ECF Nos. 20, 22.
[64] ECF No. 24.
[65] ECF No. 46.
[66] ECF No. 47.
[67] *See* ECF No. 63.
[68] *See* Mot. for Default J.

## DISCUSSION

The Commission seeks default judgment against Defendants; a permanent injunction against Defendants; and penalties against Mr. Nemeckay, including disgorgement of ill-gotten gains, pre-judgment interest, and a civil penalty. The court addresses each matter in order.

### I.   Default Judgment

After the clerk of court has entered default against a defendant for failing to plead or otherwise defend in an action, a plaintiff may move for default judgment.[69] The movant may seek judgment from the clerk of court if the requested amount is for a sum certain. Otherwise, the movant must apply to the court.[70] A "party is not entitled to a default judgment as a matter of right, even where the defendant is technically in default."[71] The movant must overcome two hurdles in obtaining default judgment: alleging sufficient facts to establish the court's jurisdiction and demonstrating that it merits default judgment. "[C]onsiderable deference is given [to] the trial judge's determination regarding the default judgment."[72]

The SEC obtained a certificate of default for Defendants and now moves for default judgment.[73] The claim is not for a sum certain.[74] As such, the court must determine if the SEC pleads sufficient facts to establish jurisdiction and to show that default judgment is proper.

---

[69] Fed. R. Civ. P. 55(a).
[70] *Id.* at 55(b).
[71] *J & J Sports Prods., Inc. v. Chavez*, No. 17-cv-166, 2018 WL 5660757, at *1 (N.D. Okla. Sept. 18, 2018) (quoting *Lewis v. Lynn*, 236 F.3d 766, 767 (5th Cir. 2001)).
[72] *Katzson Bros., Inc. v. EPA*, 839 F.2d 1396, 1399 (10th Cir. 1988).
[73] ECF No. 24.
[74] *See* Mot. for Default J. 20–24 (seeking disgorgement, prejudgment interest, and a third-tier civil penalty).

### A.   The Court Has Subject Matter Jurisdiction Over the Case and Can Exercise Personal Jurisdiction Over Defendants.

In deciding a motion for default judgment, the court must first determine "whether it has subject matter jurisdiction over the case and personal jurisdiction over [the defendant]."[75] Neither issue is in dispute. The court has "original jurisdiction of all civil actions arising under the . . . laws . . . of the United States."[76] Here, the Commission brings its enforcement action pursuant to federal law.[77] Thus, the court has subject matter jurisdiction over the action.

The court must next determine if it has personal jurisdiction over Defendants. A showing of personal jurisdiction requires proof of service of process and compliance with "constitutional due process demands."[78] The Commission has made a prima facie showing that the court can exercise personal jurisdiction.[79] It has satisfied its burden to show proper service of process. Mr. Nemeckay is an individual.[80] Mine Shaft is a corporation with its principal place of business in Utah and Mr. Nemeckay serves as the corporation's sole manager.[81] Under Federal Rule of Civil Procedure 4, a plaintiff may serve an individual by delivering a copy of the summons and complaint to that individual personally.[82] For a corporation, the plaintiff may deliver the required

---

[75] *Warming Trends, LLC v. Flame DesignZ, LLC*, No. 22-cv-00252, 2023 WL 5507793, at *3 (D. Colo. Aug. 25, 2023) (citing *Dennis Garberg & Assocs., Inc. v. Pack-Tech Int'l Corp.*, 115 F.3d 767, 772 (10th Cir. 1997)); *see Morris v. Khadr*, 415 F. Supp. 2d 1323, 1331 (D. Utah 2006) ("The Tenth Circuit has instructed district courts to assess their subject matter jurisdiction and personal jurisdiction before granting default judgment."); *see also Niemi v. Lasshofer*, 770 F.3d 1331, 1347 (10th Cir. 2014) ("A default judgment . . . is void if there is no personal jurisdiction over the defendant.") (citation omitted).
[76] 28 U.S.C. § 1331.
[77] Compl. ¶ 15 (alleging violations under 15 U.S.C. §§ 77t(b), 77t(d), 78u(d), 78u(e)).
[78] *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1070 (10th Cir. 2008).
[79] *See Bittichesu v. Premier Renewables LLC*, No. 23-cv-00340, 2023 WL 4847584, at *2 (D. Colo. July 28, 2023) ("[T]he plaintiff need only make a prima facie showing [of personal jurisdiction] if the motion [for default judgment] is decided only on the basis of the parties' affidavits and other written materials." (alterations in original) (quoting *Dennis Garberg*, 115 F.3d at 773)).
[80] Compl. ¶ 20.
[81] *Id.* at ¶ 19.
[82] Fed. R. Civ. P. 4(e)(2)(A).

materials to a corporate officer.[83] The Commission provided valid proof of service for Mr. Nemeckay[84] and Mine Shaft.[85]

The Complaint demonstrates the court can exercise personal jurisdiction over Defendants. Mine Shaft's principal place of business is in Utah.[86] And as pled, Mr. Nemeckay is a resident of Park City, Utah.[87] Courts "can exercise general jurisdiction over any claims against defendants who are 'essentially at home' [in the forum state], as when an individual is domiciled in the [s]tate or a corporation . . . has its principal place of business there[.]"[88] This is the case here. As a result, the court has subject matter jurisdiction over the action and can exercise personal jurisdiction over Defendants.

### B. The Unchallenged Facts Demonstrate that the SEC is Entitled to Default Judgment on Its Claims Against Defendants.

Since Defendants have not responded to the Commission's allegations, the court treats the well-pleaded facts in the Complaint as true.[89] "[I]t remains [only] for the court to consider whether the unchallenged facts constitute a legitimate cause of action, since a party in default does not admit mere conclusions of law."[90] In other words, "[t]here must be a sufficient basis in the pleadings for the judgment entered."[91] The court therefore turns to the five alleged violations under the Securities Act and the Exchange Act.

---

[83] *Id.* at 4(h)(1)(B).
[84] ECF No. 15 (proof of service personally to Mr. Nemeckay).
[85] ECF No. 14 (proof of service personally to Mr. Nemeckay as the managing member of Mine Shaft).
[86] Compl. ¶ 19.
[87] *Id.* at ¶ 20.
[88] *Hood v. Am. Auto Care, LLC*, 21 F.4th 1216, 1221 (10th Cir. 2021) (citations omitted).
[89] A failure to deny a well-pleaded allegation, other than an allegation of damages, constitutes an admission of the fact. *See* Fed. R. Civ. P. 8(b)(6).
[90] *Bixler v. Foster*, 596 F.3d 751, 762 (10th Cir. 2010) (citation omitted).
[91] *Id.* (quoting *Nishimatsu Constr. Co. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975)).

### 1.    Section 5(a) and Section 5(c) of the Securities Act

The Commission first alleges Defendants violated Sections 5(a) and 5(c) of the Securities Act. These provisions make it unlawful for a person, directly or indirectly, to "make use of any means or instruments of transportation or communication in interstate commerce or of the mails" to sell or deliver for sale unregistered securities[92] or to offer to sell a security without having filed a registration statement.[93] To make out a prima facie case, a plaintiff must prove the following: "(1) no registration statement was in effect as to the securities, (2) the defendant sold or offered to sell these securities, and (3) interstate transportation or communication and the mails were used in connection with the sale or offer of sale."[94] The plaintiff need not prove scienter.[95] And a defendant may assert exemptions as affirmative defenses.[96] But first, the Commission must show that Defendants offered for sale or sold securities.

#### a.    The Mine Shaft Interests Are Securities.

The "question of whether an instrument is a security is 'a question of law and not of fact[.]'"[97] The Securities Act applies to instruments where there is a "scheme involv[ing] an investment of money in a common enterprise with profits to come solely from the efforts of

---

[92] 15 U.S.C. § 77e(a).

[93] *Id.* § 77e(c).

[94] *SEC v. GenAudio Inc.*, 32 F.4th 902, 939 (10th Cir. 2022) (citation omitted).

[95] *SEC v. Calvo*, 378 F.3d 1211, 1215 (11th Cir. 2004) (collecting cases); *accord Schooler*, 905 F.3d at 1115; *Swenson v. Engelstad*, 626 F.2d 421, 424 (5th Cir. 1980); *SEC v. Universal Major Indus. Corp.*, 546 U.S. 1044, 1047 (2d Cir. 1976).

[96] *See GenAudio*, 32 F.4th at 939–40 (The "'burden of proof is clearly upon' those litigants 'claiming [the exemption's] benefit, as public policy strongly supports registration.'" (quoting *Quinn & Co. v. SEC*, 452 F.2d 943, 945–46 (10th Cir. 1971), *cert. denied*, 406 U.S. 957 (1972))).

[97] *SEC v. Thompson*, 732 F.3d 1151, 1161 (10th Cir. 2013) (quoting *Ahrens v. Am.-Can. Beaver Co.*, 428 U.S. 926, 928 (10th Cir. 1970)).

others."[98] Courts "disregard form over substance and focus on the economic realities underlying a transaction, and not on the name appended thereto."[99]

Without question, there was a scheme and a common enterprise. Mr. Nemeckay and the other Mine Shaft executives offered to sell potential investors convertible promissory notes and Series A Membership Interests. Investors' money would purportedly finance a brewery and restaurant in Park City and later a line of hard seltzer beverages in California. In return for the investments, Mine Shaft executives promised that investors would see returns in 3–5 years, that Mine Shaft was "getting ready to move forward on production soon," and that the money principally would go to equipment, improvements, inventory, and other business expenses.[100] In total, over one hundred investors paid about $2.7 million for Mine Shaft interests.[101]

The third element is also satisfied because any return would not have resulted from investors' efforts. Generally, investments are considered securities when "the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise."[102] Here, the unopposed facts show that Mine Shaft's personnel—not investors—would further the enterprise's efforts through the promotion of alcoholic beverages and the building of a brewery and restaurant.[103] Finally, the Form Ds even acknowledged that the Mine Shaft interests were "securities."[104] The Mine Shaft

---

[98] *SEC v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946); *see Klein v. Roe*, 76 F.4th 1020, 1035 (10th Cir. 2023).
[99] *SEC v. Scoville*, 913 F.3d 1204, 1220 (10th Cir. 2019) (citation and internal quotation marks omitted).
[100] Compl. ¶¶ 4, 46, 51.
[101] *Id.* at ¶¶ 23, 25.
[102] *Maritan v. Birmingham Props.*, 875 F.2d 1451, 1457 (10th Cir. 1989) (citation omitted).
[103] Compl. ¶¶ 4, 8, 24–25.
[104] Blaylock Decl. ¶¶ 16–17 & Ex. 6–7.

interests thus qualify as securities. The court next analyzes the required elements under Sections 5(a) and 5(c).

> ### b. The Unopposed Facts Show that There Was No Registration Statement and that Defendants Sold or Offered to Sell the Securities Using Means of Communication in Interstate Commerce.

Defendants did not register Mine Shaft securities with the Commission.[105] Yet Mr. Nemeckay, individually and on behalf of Mine Shaft, offered and sold Mine Shaft securities to numerous investors.[106] Specifically, investors received PPMs, subscription agreements, pitch decks, newsletters, press releases, and direct emails. And Defendants utilized interstate communications such as online platforms and the mail to do so.[107] For these reasons, the Commission makes out a prima facie case for Defendants' violation of Sections 5(a) and 5(c) of the Securities Act.

Because Defendants are in default, they do not offer any affirmative defenses in rebuttal.[108] The Commission is thus entitled to judgment against Mr. Nemeckay and Mine Shaft for violations of Section 5(a) and Section 5(b) of the Securities Act.

### 2. Section 15(a)(1) of the Exchange Act

Next, the Commission alleges Mr. Nemeckay violated Section 15(a)(1) of the Exchange Act. Under this section, it is "unlawful for any broker or dealer . . . to make use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security . . . unless such broker or dealer is

---

[105] Compl. ¶¶ 60, 72.
[106] *Id.* at ¶¶ 23, 27–32, 39–40.
[107] *Id.* at ¶¶ 16, 27, 40, 49, 79.
[108] *See Busch v. Carpenter*, 827 F.2d 653, 656 (10th Cir. 1987) (citing *SEC v. Ralston Purina Co.*, 346 U.S. 119, 126 (1953)).

14

registered . . . ."[109] The statute involves strict liability.[110] As defined by the Exchange Act, a

"broker" is one "engaged in the business of effecting transactions in securities for the account of

others."[111] Courts consider the "totality of the circumstances" to determine if a person acts as a

broker.[112] Six factors, first mentioned in *SEC v. Hansen*,[113] are typically examined[114]:

> (i) whether the person works as an employee of the securities' issuer; (ii) whether
> he receives a commission rather than a salary; (iii) whether he sells or has sold the
> securities of another issuer; (iv) whether he participates in negotiations between the
> issuer and investor; (v) whether he provides advice or a valuation as to the merit of
> an investment; and (vi) whether he actively, rather than passively, finds
> investors.[115]

"Some courts have given particular weight to the factor of whether the person regularly

participates in securities transactions at key points; others have deemed transaction-based

compensation to be 'one of the hallmarks' of a broker."[116] "[A]ll factors need not be satisfied."[117]

Several *Hansen* factors support the finding that Mr. Nemeckay acted as a broker. He was

Mine Shaft's President, Secretary, and Board Manager.[118] Mine Shaft paid him more than $1.7

million from investor funds.[119] What is more, Mr. Nemeckay transferred those funds to his

---

[109] 15 U.S.C. § 78*o*(a)(1).

[110] *SEC v. Merrill Scott & Assocs., Ltd.*, 505 F. Supp. 2d 1193, 1216 (D. Utah 2007); *accord SEC v. RMR Asset Mgmt. Co.*, 553 F. Supp. 3d 820, 826 (S.D. Cal. 2021), *aff'd sub nom. SEC v. Murphy*, 50 F.4th 832 (9th Cir. 2022); *SEC v. CKB168 Holdings, Ltd.*, 210 F. Supp. 3d 421, 453 (E.D.N.Y. 2016); *George K. Baum Advisors, L.L.C. v. Sprint Spectrum, L.P.*, No. 11-2442, 2013 WL 5719506, at *20 (D. Kan. Oct. 21, 2013).

[111] 15 U.S.C. § 78c(a)(4)(A).

[112] *SEC v. Forester*, No. CV 20-9813, 2021 WL 4803475, at *3 (C.D. Cal. Sept. 17, 2021).

[113] No. 83 Civ. 3692, 1984 WL 2413 (S.D.N.Y. Apr. 6, 1984).

[114] *See, e.g.*, *SEC v. Art Intellect, Inc.*, No. 2:11-cv-00357, 2013 WL 840048, at *20 (D. Utah Mar. 6, 2013) (citing *Hansen*, 1984 WL 2413, at *10); *accord SEC v. Hui Feng*, 935 F.3d 721, 731 (9th Cir. 2019) (collecting cases from the Sixth, Eighth, and Eleventh Circuits).

[115] *SEC v. Erwin*, No. 13-cv-03363, 2021 WL 3773649, at *11 (D. Colo. Aug. 25, 2021), *mot. for relief from j. denied*, 2021 WL 4307117 (D. Colo. Sept. 22, 2021), and *appeal dismissed sub nom. SEC v. Malouf*, No. 21-1327, 2021 WL 7543742 (10th Cir. Dec. 6, 2021) (not selected for publication).

[116] *Sun River Energy, Inc. v. Nelson*, No. 11-cv-00198, 2013 WL 1222391, at *5 (D. Colo. Mar. 25, 2013) (quoting *SEC v. Kramer*, 778 F. Supp. 2d 1320, 1334 (M.D. Fla. 2011)).

[117] *Erwin*, 2021 WL 3773649, at *11 (citing *Hansen*, 1984 WL 2413, at *10–11).

[118] Compl. ¶ 20.

[119] *Id.* at ¶ 58.

checking account for own enrichment.[120] Additionally, he participated directly in negotiations between prospective investors and Mine Shaft. He was instrumental in soliciting investors by sending emails, PPMs, and newsletters.[121] Mr. Nemeckay also sought out and advised investors on the merits of their investments.[122] For example, he told investors their returns would yield an 8% annual interest and pay out in 3 to 5 years.[123] None of these efforts were passive.[124]

 Mr. Nemeckay never registered as a broker with the Commission or associated with any entity registered as a broker.[125] He used means of communication in interstate commerce—chiefly email—to solicit investors.[126] Accordingly, the court grants judgment to the SEC on Mr. Nemeckay's violation of Section 15(a)(1) of the Exchange Act.

### 3. Section 15(b)(6)(B)(i) of the Exchange Act

 The Commission also alleges Mr. Nemeckay violated Section 15(b)(6)(B)(i) of the Exchange Act. Under this provision, an individual who is subject to an associational bar may not, without the Commission's consent, willfully become, or be, "associated with a broker or dealer in contravention of such order," or participate "in an offering of penny stock in contravention of such order[.]"[127] "The term 'willful' . . . signifies merely that the defendant intended to commit

---

[120] *Id.* at ¶ 67.
[121] *Id.* at ¶¶ 32–53.
[122] *Id.* at ¶¶ 75–77.
[123] Compl. ¶¶ 46, 51.
[124] *See, e.g.*, *Hansen*, 1984 WL 2413, at *11 ("[Defendant] was an active and aggressive finder of investors and he frequently gave those investors extensive advice with regard to the merits of the [investment] programs.")
[125] Compl. ¶¶ 26, 74.
[126] *Id.* at ¶¶ 39–43.
[127] 15 U.S.C. § 78*o*(b)(6)(B)(i).

the act which constitutes the violation."[128] "There is no requirement that the actor also be aware that he is violating one of the Rules or Acts."[129]

In 2016, the Commission barred Mr. Nemeckay from "association with any broker [or] dealer, and [from] participating in any penny stock offering."[130] By acting as a broker for Mine Shaft when he offered and sold securities to investors, Mr. Nemeckay thus "associated" with a broker-dealer. And the uncontested facts show he did so willfully. He intentionally sought investors for Mine Shaft securities, offered them convertible promissory notes, sent them false and misleading PPMs, and made several written misrepresentations and omissions, all with the intent to induce prospective investors to buy Mine Shaft securities.[131] After selling the securities, Mr. Nemeckay then used part of those proceeds to make note payments to prior investors and pay restitution for his 2014 Utah securities violations.[132]

The court therefore grants judgment for the Commission on Mr. Nemeckay's violation of Section 15(b)(6)(B)(i) of the Exchange Act.

### 4.    Section 17(a) of the Securities Act

Next, the Commission alleges Defendants violated Section 17(a) of the Securities Act. This provision is "designed to protect 'investors from fraudulent practices.'"[133] It makes it unlawful for a person offering or selling securities by means or instruments of communication or

---

[128] *SEC v. Martino*, 255 F. Supp. 2d 268, 285 (S.D.N.Y. 2003); *see United States v. Valencia*, 907 F.2d 671, 683 (7th Cir. 1990) ("[M]ean[ing] only that the person charged . . . knows what he is doing." (cleaned up)); *see also Willful*, Black's Law Dictionary (11th ed. 2019) ("Voluntary and intentional[.]"); *Willful*, Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/willful (last visited Oct. 3, 2023) ("[D]one deliberately: INTENTIONAL[.]").
[129] *Decker v. SEC*, 631 F.2d 1380, 1386 (10th Cir. 1980) (quoting *Tager v. SEC*, 344 F.2d 5, 8 (2d Cir. 1965)).
[130] Compl. ¶ 20.
[131] *Id.* at ¶¶ 26–29.
[132] *Id.* at ¶¶ 20, 68–69.
[133] *SEC v. Smart*, 678 F.3d 850, 857 (10th Cir. 2012) (citation omitted).

transport in interstate commerce or the mails: (1) to "employ any device, scheme, or artifice to defraud"; (2) to "obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading"; or (3) "to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."[134] The Commission asserts Defendants violated each section.

### a.    Section 17(a)(1)

Under Section 17(a)(1), it is not enough for the SEC to simply show that one employs a "device, scheme, or artifice to defraud[.]"[135] The SEC must also establish scienter[136]: a "mental state embracing intent to deceive, manipulate, or defraud."[137] A showing of recklessness is also sufficient.[138] Courts define recklessness as "conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it[.]"[139]

Mr. Nemeckay and the other Mine Shaft executives sent prospective investors false or misleading information. The PPMs named Mr. Logan as Mine Shaft's CFO, implying that he oversaw Mine Shaft's financial affairs.[140] But Mr. Logan did not oversee or manage Mine

---

[134] 15 U.S.C. § 77q(a).

[135] *Id.* § 77q(a)(1).

[136] *Aaron v. SEC*, 446 U.S. 680, 701 (1980).

[137] *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976); *see, e.g.*, *Lorenzo v. SEC*, 587 U.S. ___, 139 S. Ct. 1094, 1100–01 (2019) (finding a violation where the defendant sent emails containing material untruths to prospective investors with the "intent to deceive, manipulate, or defraud").

[138] *Smart*, 678 F.3d at 857; *see Edward J. Mawod & Co. v. SEC*, 591 F.2d 588, 596 (10th Cir. 1979) ("The prevailing rule would appear to be that willful or reckless behavior satisfies the scienter requirement.").

[139] *City of Philadelphia v. Fleming Cos.*, 264 F.3d 1245, 1258 (10th Cir. 2001) (citation omitted); *see Smallen v. The W. Union Co.*, 950 F.3d 1297, 1305 (10th Cir. 2020) ("In the securities-fraud context, recklessness is akin to conscious disregard.").

[140] Compl. ¶ 33(a).

Shaft's finances.[141] The memoranda also omitted key facts as to Mr. Nemeckay: that Utah barred

him from associating with any broker or dealer, barred him from becoming licensed, and fined

him $350,000; and that the Commission barred him from associating with any broker or dealer or

participating in any penny stock offering.[142] Instead, the PPMs falsely implied that the

Commission actually approved Mine Shaft's securities offerings and Mr. Nemeckay's

involvement.[143] Plus, the memoranda did not disclose that the Mine Shaft executives were

individually receiving most of the investor funds—over $1.7 million.[144]

      Through email, Mr. Nemeckay told prospective investors that the SEC had sanctioned the

Mine Shaft venture, that Mr. Nemeckay was a whistleblower, and that investors would see their

returns in 3–5 years because Mine Shaft was ready to start production "soon."[145] None of these

statements were true.[146] Defendants also told investors that 70% of their funds would support

brewery and restaurant equipment, tenant improvements, and inventory.[147] But these statements

were also false. Only $550,000—about 20%—went to business costs such as marketing, travel,

and legal fees.[148] The remainder went to Mine Shaft executives, prior Mine Shaft investors, or

defrauded investors as restitution for Mr. Nemeckay's 2014 securities violations.[149]

      Defendants sent newsletters with false or misleading information. For example,

newsletters stated how Mine Shaft had secured millions in investments, had "key meetings

---

[141] *Id.*
[142] *Id.* at ¶ 33(b)–(c).
[143] *Id.* at ¶¶ 33(e), 34–36.
[144] *Id.* at ¶¶ 37, 65–67.
[145] Compl. ¶¶ 41, 43, 46.
[146] *Id.* at ¶¶ 42, 44, 48.
[147] *Id.* at ¶ 62.
[148] *Id.* at ¶ 63.
[149] *Id.* at ¶¶ 65–69; Blaylock Decl. ¶¶ 29–35.

scheduled with potentially significant investors," and described how investors would receive an 8% return and other perks like "[f]irst access to limited production beers and ciders at the brewery."[150] One newsletter discussed how a "very small number of [Mine Shaft] investors" opposed the move from Park City to California and had complained to Utah securities regulators.[151] Mine Shaft told investors not to be alarmed and stated that "there is no requirement to respond."[152] Courts describe how a "post-fraud 'lulling letter' . . . [is] an essential part of a scheme to defraud . . . ."[153] "[A] communication will be mail fraud . . . if it is intended to 'lull the victims into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the apprehension of the defendants less likely.'"[154] Here, Defendants tried to do both: lull investors into a false sense of security and postpone complaints to securities regulators.

The uncontested facts show that Defendants acted with scienter. Defendants intentionally and repeatedly sent investors PPMs, emails, and newsletters containing false information.[155] What is more, Mine Shaft used investors' funds to repay prior investors. Executing what is in effect a Ponzi scheme[156] makes "the question of intent to defraud . . . not debatable."[157] Without telling investors, Mr. Nemeckay also funneled investor funds into his checking account for

---

[150] Compl. ¶¶ 50–53.

[151] *Id.* at ¶ 53.

[152] *Id.*

[153] *United States v. Redcorn*, 528 F.3d 727, 741 (10th Cir. 2008); *see United States v. Fishman*, 645 F.3d 1175, 1192 (10th Cir. 2011) (citing *United States v. Maze,* 414 U.S. 395, 403 (1974)).

[154] *Redcorn*, 528 F.3d at 741 (quoting *Maze*, 414 U.S. at 403).

[155] Compl. ¶¶ 30–31, 39, 49.

[156] *See In re Primeline Sec. Corp.*, 295 F.3d 1100, 1104 n.2 (10th Cir. 2002) ("The term '[P]onzi scheme' refers to an investment scheme whereby returns to investors are financed, not through the success of an underlying business venture, but from the principal sums of newly attracted investors. Typically, investors are promised large returns for their investments. Initial investors are actually paid the promised returns, attracting additional investors.").

[157] *Conroy v. Shott*, 363 F.2d 90, 92 (6th Cir. 1966); *see Hafen v. Howell*, No. 2:19-cv-00813, 2023 WL 2188566, at *8 (D. Utah Feb. 23, 2023), *amended*, 2023 WL 5000944 (D. Utah Aug. 4, 2023) (citing *Wing v. Dockstader*, 482 F. App'x 361, 363 (10th Cir. 2012) (unpublished)).

personal enrichment and to pay restitution for earlier securities violations. "His actions evidence a 'highly unreasonable omission' and 'an extreme departure from the standards of ordinary care' that [Mr. Nemeckay] knew or should have known would have misled [Mine Shaft]'s investors and the Commission."[158] Simply put, Defendants willfully used interstate commerce to send false or misleading communications. For these reasons, the court grants judgment to the Commission on Mr. Nemeckay's Section 17(a)(1) violation.

### b.    Section 17(a)(2)

For Section 17(a)(2), the SEC "must prove that the defendants *directly or indirectly* obtained money or property by means of an untrue statement of material fact or an omission to state a material fact."[159] Unlike Section 17(a)(1), the SEC need establish only negligence.[160] "A defendant acts negligently in stating or omitting a material fact if he 'fail[s] to use the degree of care and skill that a reasonable person of ordinary prudence and intelligence would be expected to exercise in the situation.'"[161]

It is undisputed Defendants received over $2.7 million from investors after intentionally or recklessly making false statements or omissions. The question is whether such representations were material. "A statement or omission is only material if a reasonable investor would consider it important in determining whether to buy or sell [securities]."[162] Defendants informed

---

[158] *Lowry v. SEC*, 340 F.3d 501, 506 (8th Cir. 2003) (citation omitted); *see SEC v. George*, 426 F.3d 786, 796 (6th Cir. 2005) ("Neither does [the defendant] deny that he spent investor funds on personal expenses, a fact that itself establishes the requisite state of mind for committing securities fraud.").

[159] *SEC v. Coddington*, No. 13-cv-03363, 2015 WL 1401679, at *8 (D. Colo. Mar. 23, 2015); 17 U.S.C. § 77q(a)(2).

[160] *GenAudio Inc.*, 32 F.4th at 921.

[161] *SEC v. St. Anselm Expl. Co.*, 936 F. Supp. 2d 1281, 1293 (D. Colo. 2013) (alteration in original) (quoting *SEC v. True North Finance Corp.*, 909 F. Supp. 2d 1073, 1122 (D. Minn. 2012)); *see Robare Grp., Ltd. v. SEC*, 922 F.3d 468, 477 (D.C. Cir. 2019) ("Negligence is the failure to 'exercise reasonable care under all the circumstances.'" (quoting Restatement (Third) of Torts: Liability for Physical & Emotional Harm § 3 (Am. L. Inst. 2010))).

[162] *GenAudio*, 32 F.4th at 921; *see Indiana Pub. Ret. Sys. v. Pluralsight, Inc.*, 45 F.4th 1236, 1262–63 (10th Cir. 2022) ("Information is material if there is 'a substantial likelihood that the disclosure of the omitted fact would have

prospective investors that Mine Shaft was "getting ready to move forward on production soon."[163] Yet Mine Shaft had no fixed date for production; indeed, it never started construction on a restaurant or brewery or produced any beverages for sale.[164] In addition, Defendants represented that over 70% of investments would go to equipment, improvements, and inventory.[165] Defendants certainly did not say that the vast bulk of funds would benefit Mine Shaft executives personally, pay off prior Mine Shaft investors, or help Mr. Nemeckay pay restitution for his previous securities violations.[166] A reasonable person considering a Mine Shaft investment would think that the use of invested funds and Mine Shaft's progress were important. As such, the SEC has met its burden to show Defendants violated Section 17(a)(2).

### c.    Section 17(a)(3)

Section 17(a)(3) of the Securities Act prohibits a person from engaging in "any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."[167] The Commission need demonstrate only negligence.[168] Having shown Defendants violated the first two sections, the Commission also prevails under Section 17(a)(3). The court thus grants judgment to the Commission on Defendants' violation of Section 17(a).

### 5.    Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5

The Commission further alleges Defendants violated Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5. Section 10(b)'s purpose is "to substitute a philosophy of full

---

been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'" (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011))).
[163] Compl. ¶ 46.
[164] *Id.* at ¶ 48.
[165] *Id.* at ¶ 62.
[166] *Id.* at ¶¶ 63–70; Blaylock Decl. ¶¶ 29–35.
[167] 15 U.S.C. § 77q(a).
[168] *Smart*, 678 F.3d at 857.

disclosure for the philosophy of *caveat emptor* and thus to achieve a high standard of business ethics in the securities industry."[169] These two provisions "capture a wide range of conduct"[170] and "prohibit making any material misstatement or omission in connection with the purchase or sale of any security."[171] To prevail, the Commission must show "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."[172] Scienter means "'intent to deceive, manipulate, or defraud,' or recklessness."[173] There is "considerable overlap among the subsections of the Rule and related provisions of the securities laws" such as Section 17(a).[174]

For the reasons explained above, the uncontested facts establish Defendants' violation of Section 10(b) and Rule 10b-5. Defendants intentionally or recklessly made material misrepresentations and omissions connected to investors' purchase of Mine Shaft securities. Prospective investors relied on Defendants' statements. And their reliance led to financial losses.[175] Accordingly, the court grants judgment to the Commission on Defendants' violation of Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5.

---

[169] *Lorenzo*, 139 S. Ct. at 1094.

[170] *Id*. at 1101.

[171] *Smallen*, 950 F.3d at 1304.

[172] *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 460 (2013) (citation omitted).

[173] *Anderson v. Spirit Aerosystems Holdings, Inc.*, 827 F.3d 1229, 1237 (10th Cir. 2016), *as amended* (July 6, 2016) (citation omitted).

[174] *Lorenzo*, 139 S. Ct. at 1102–03 (citing *Herman & MacLean v. Huddleston*, 459 U.S. 375, 383 (1983)); *see also Woods v. Homes & Structures of Pittsburg, Kan., Inc.*, 489 F. Supp. 1270, 1284 (D. Kan. 1980) ("[W]e have found little practical advantage in determining whether an implied cause of action exists under Section 17(a) of the 1933 Act because of the substantial overlap with Rule 10b-5 claims.").

[175] Compl. ¶¶ 5–7, 27, 46–48, 51, 59, 63–70.

## II.    Permanent Injunctions

The SEC seeks to permanently enjoin Defendants from violating Sections 5 and 17(a) of the Securities Act, Sections 10(b) and 15(a)(1) of the Exchange Act, and Exchange Act Rule 10b-5. Additionally, the SEC seeks to permanently enjoin Mr. Nemeckay from committing a violation of Section 15(b)(6)(B)(i) of the Exchange Act; permanently enjoin him from participating in the "issuance, purchase, offer, or sale of any security (except for the purchase or sale of securities listed on a national securities exchange for his own personal accounts)"; and bar him from serving as an officer or director of an issuer with a class of securities registered under Section 12 of the Exchange Act.[176]

"An injunction based on the violation of securities laws is appropriate if the SEC demonstrates a reasonable and substantial likelihood that the defendant, if not enjoined, will violate securities laws in the future."[177] The court considers several factors to determine the likelihood of future violations: "the seriousness of the violation, the degree of scienter, whether defendant's occupation will present opportunities for future violations and whether defendant has recognized his wrongful conduct and gives sincere assurances against future violations."[178] "Although no single factor is determinative, [courts] have previously held that the degree of scienter 'bears heavily' on the decision."[179] A "knowing violation . . . will justify an injunction" more so than mere negligence.[180]

---

[176] Mot. for Default J. 18.
[177] *SEC v. Pros Int'l, Inc.*, 994 F.2d 767, 769 (10th Cir. 1993); *accord SEC v. Youmans*, 729 F.2d 413, 415 (6th Cir. 1984), *cert. denied*, 469 U.S. 1034 (1984); *SEC v. Bonastia*, 614 F.2d 908, 912 (3d Cir. 1980); *see* 15 U.S.C. §§ 77t(b), 78u(d).
[178] *Pros Int'l*, 994 F.2d at 769; *see also SEC v. Blatt*, 583 F.2d 1325, 1334 (5th Cir. 1978).
[179] *Pros Int'l*, 994 F.2d at 769.
[180] *Id.* But "if there is a sufficient showing that the violation is likely to recur, an injunction may be justified even for a negligent violation of § 17(a)(2) or (3)." *Id.* (citing *Aaron,* 446 U.S. at 700–01).

A court may enjoin "any person who violated [Section 17(a)(1) of the Securities Act] from acting as an officer or director of any issuer that has a class of securities registered pursuant to [the Exchange Act] . . . if the person's conduct demonstrates *unfitness* to serve as an officer or director . . . ."[181] Courts have weighed several factors in making the "unfitness" determination: "(1) the 'egregiousness' of the underlying securities law violation, (2) the defendant's 'repeat offender' status, (3) the defendant's 'role' or position when he engaged in the fraud, (4) the defendant's degree of scienter, (5) the defendant's economic stake in the violation, and (6) the likelihood that misconduct will recur."[182] A court need not apply all factors.[183]

Taking the above factors into account, the court finds that a permanent injunction against Mr. Nemeckay and Mine Shaft is necessary to prevent future violations. Defendants willfully or recklessly violated several provisions of the Securities Act and the Exchange Act. Despite his 2014 and 2016 bars from associating with a broker-dealer, Mr. Nemeckay continued to willfully solicit investors for Mine Shaft securities. In furtherance of this fraudulent scheme, he repeatedly sent false and misleading information to prospective investors and later attempted to lull investors. Mr. Nemeckay and other Mine Shaft executives pocketed the bulk of investment funds that were supposed to go toward construction and other legitimate business expenses. Mr. Nemeckay alone received more than $1.7 million. Significantly, Mr. Nemeckay diverted at least $312,000 in investor funds to pay restitution stemming from his 2014 violations of Utah securities laws. And Mr. Nemeckay has not appeared in this action to rebut the allegations. He

---

[181] 15 U.S.C. § 77t(e) (emphasis added); *see* 15 U.S.C. § 77u(d)(2).
[182] *SEC v. Intelliquis Int'l, Inc.*, No. 2:02-cv-00674, 2003 WL 23356426, at *19 (D. Utah Dec. 11, 2003) (quoting *SEC v. Patel*, 61 F.3d 137, 141 (2d Cir. 1995)); *accord SEC v. Hall*, 759 F. App'x 877, 884 (11th Cir. 2019) (unpublished); *SEC v. First Pac. Bancorp*, 142 F.3d 1186, 1193 (9th Cir. 1998).
[183] *Intelliquis Int'l*, 2003 WL 23356426, at *19.

has certainly not given "sincere assurances against future violations."[184] As a result of all the foregoing, there is a significant likelihood Mr. Nemeckay would violate federal securities laws either personally or on behalf of a company he controls.

The unchallenged allegations also demonstrate Mr. Nemeckay's unfitness to serve as an officer or director. He is a repeat offender. He blatantly violated securities laws by intentionally crafting false and misleading PPMs, sending false or misleading emails, and issuing newsletters to discourage investors from cooperating with securities regulators. And he violated the regulations while serving as the sole and managing member of Mine Shaft—a purported issuer of securities. He immensely benefitted from the Mine Shaft scheme. In short, Mr. Nemeckay's actions show a high likelihood of future fraudulent conduct. The court finds that a permanent bar to service as an officer or director under Section 20(e) of the Securities Act is appropriate.

## III.   Penalties

The Commission moves the court to order disgorgement of Mr. Nemeckay's ill-gotten gains and to impose third-tier civil penalties. Each request is discussed below.

### 1.   Disgorgement of Mr. Nemeckay's Ill-Gotten Gains Is Proper.

The court may grant "any equitable relief that may be appropriate or necessary for the benefit of investors."[185] One such form of relief is disgorgement. "[D]isgorgement is a form of '[r]estitution measured by the defendant's wrongful gain.'"[186] "A disgorgement order that 'results in a "reasonable approximation" of illegal profits' falls within a district court's broad

---

[184] *SEC v. Smart*, No. 2:09-cv-00224, 2011 WL 2297659, at *20 (D. Utah June 8, 2011), *aff'd*, 678 F.3d 850 (10th Cir. 2012).

[185] 15 U.S.C. § 78u(d)(5).

[186] *GenAudio*, 32 F.4th at 944 (quoting *Kokesh v. SEC*, 581 U.S. 455, 459 (2017)); *see Liu v. SEC*, 591 U.S. ___, 140 S. Ct. 1936, 1940 (2020) (holding that courts may enter a disgorgement award "that does not exceed a wrongdoer's net profits").

discretion to order equitable disgorgement."[187] The SEC bears the initial burden to produce a

reasonable approximation of the ill-gotten gains.[188] If the SEC does so, the burden shifts to the

defendant "to demonstrate [that] the SEC's estimate is not reasonable."[189] The court resolves any

ambiguity against the "wrongdoer whose illegal conduct created th[e] uncertainty."[190]

Here, the SEC provides evidence that Mr. Nemeckay received at least $1,707,578.50

from investor funds.[191] Of that amount, $1,451,623 was transferred to his checking account for

personal expenses.[192] The remainder went toward restitution for his 2014 Utah securities

violations.[193] Because Mr. Nemeckay is in default and offers no rebuttal, and the SEC offers

evidence in the form of a signed declaration, $1,707,578.50 is a reasonable approximation of Mr.

Nemeckay's ill-gotten gains.

### 2. The Commission Fails to Show that an Award of $838,385.55 in Prejudgment Interest Is Appropriate.

The SEC also seeks an award of prejudgment interest. "The decision whether to grant

prejudgment interest and the rate used if such interest is granted are matters confided to the

district court's broad discretion[.]"[194] A court should consider "(i) the need to fully compensate

---

[187] *SEC v. Camarco*, No. 19-1486, 2021 WL 5985058, at *14 (10th Cir. Dec. 16, 2021) (not selected for publication) (quoting *SEC v. Maxxon, Inc.*, 465 F.3d 1174, 1179 (10th Cir. 2006)).

[188] *Id.* at *16 (quoting *U.S. Commodity Futures Trading Comm'n v. Tayeh*, 848 F. App'x 827, 828 (11th Cir. 2021) (unpublished)).

[189] *Levin*, 849 F.3d at 1006 (citation omitted); *accord SEC v. CMKM Diamonds, Inc.*, 729 F.3d 1248, 1261 (9th Cir. 2013); *SEC v. Gordon*, 822 F. Supp. 2d 1144, 1158 (N.D. Okla. 2011), *aff'd*, 522 F. App'x 448 (10th Cir. 2013) (unpublished).

[190] *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1232 (D.C. Cir. 1989); *accord SEC v. Lorin*, 76 F.3d 458, 462 (2d Cir. 1996); *SEC v. Koenig*, 532 F. Supp. 2d 987, 994 (N.D. Ill. 2007), *aff'd in part and remanded*, 557 F.3d 736 (7th Cir. 2009); *see SEC v. Williams*, No. 2:14-cv-00510, 2016 WL 3645158, at *2 (D. Utah June 30, 2016) ("Courts resolve ambiguity in a disgorgement calculation against the defrauding party.").

[191] Blaylock Decl. ¶ 30.

[192] *Id.* at ¶ 31.

[193] *Id.*

[194] *SEC v. Ahmed*, 72 F.4th 379, 403 (2d Cir. 2023) (citation omitted); *accord Intelliquis Int'l*, 2003 WL 23356426, at *16.

the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court."[195] "The most significant factor in awarding prejudgment interest is the remedial purpose to be served by the securities laws, recognizing that requiring interest avoids 'what amounts to an interest free loan procured as a result of illegal activity.'"[196] The applied interest rate is the Internal Revenue Service's underpayment rate pursuant to 26 U.S.C. § 6621(a)(2).[197] "This rate thus reflects 'use value,' or unearned interest that the rightful owner of the funds could have received but for the fraud."[198]

Considering the above factors, the court finds an award of prejudgment interest appropriate. Mr. Nemeckay willfully defrauded numerous investors over a period of several years.[199] It is undisputed that he held the ill-gotten gains before entry of this court's judgment. An award of interest will thus help more fully compensate investors for their losses. For the reasons detailed earlier, fairness and the relative equities align in favor of prejudgment interest. So too the remedial purpose of the statutes involved.[200] And Mr. Nemeckay has not appeared and offers no arguments regarding any factor.

The SEC contends Mr. Nemeckay should pay $838,385.55 in prejudgment interest.[201] It bases this amount on a principal of $1,707,578.50 incurred on December 31, 2013, and that

---

[195] *SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1476 (2d Cir. 1996).

[196] *SEC v. Autocorp Equities, Inc.*, 292 F. Supp. 2d 1310, 1330 (D. Utah 2003) (quoting *SEC v. Moran,* 944 F. Supp. 286, 295 (S.D.N.Y. 1996)).

[197] *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1099 (9th Cir. 2010) (citing SEC Rules and Regulations, 60 Fed. Reg. 32,738, 32,788 (June 23, 1995) (codified at 17 C.F.R. § 201.600(b))); *accord Erwin*, 2020 WL 7310584, at *5.

[198] *Ahmed*, 72 F.4th at 404.

[199] Compl. ¶ 23 (Defendants sold Mine Shaft securities to more than 100 investors for over $2.7 million).

[200] *GenAudio*, 32 F.4th at 944 ("[W]e have held that disgorgement is 'remedial rather than punitive.'" (quoting *Maxxon*, 465 F.3d at 1179)); *accord SEC v. Cavanagh*, 445 F.3d 105, 117 & n.25 (2d Cir. 2006).

[201] Decl. of Misty Reiter ¶ 3 & Ex. A, ECF No. 62-3, filed Aug. 23, 2023.

principal plus accumulated interest from January 1, 2014, to September 1, 2023.[202] In other

words, the SEC asserts that Mr. Nemeckay diverted over $1.7 million on December 31, 2013.

But Utah investigator Liz Blaylock's declaration belies this assertion. She declares that from

December 2013 to July 2020, the "analysis period," "353 payments totaling $1,707,578.50" were

made to the Nemeckay Group Inc.,[203] which Mr. Nemeckay used as a "pass through" for his

personal expenses.[204] The court cannot calculate prejudgment interest based on incorrect

assumptions. For this reason, the SEC has not satisfied its burden and the court denies without

prejudice the SEC's motion for prejudgment interest in the amount of $838,385.55.

### 3. Mr. Nemeckay Is Liable for a Third-Tier Civil Penalty.

The Commission also seeks a civil penalty against Mr. Nemeckay.[205] "Congress enacted

the civil penalties provisions 'to further the dual goals of punishment of the individual violator

and deterrence of future violations,' finding 'that disgorgement insufficiently deters securities

laws violations because it merely restores the *status quo ante*.'"[206] The court has wide discretion

in entering a civil penalty.[207] Courts typically consider several factors:

> (1) the egregiousness of the violations at issue, (2) defendants' scienter, (3) the
> repeated nature of the violations, (4) defendants' failure to admit to their
> wrongdoing; (5) whether defendants' conduct created substantial losses or the risk
> of substantial losses to other persons; (6) defendants' lack of cooperation and

---

[202] *Id.*

[203] Blaylock Decl. ¶ 30.

[204] Compl. ¶ 5.

[205] 15 U.S.C. §§ 77t(d)(1), 78u(d)(3).

[206] *SEC v. Westport Cap. Markets, LLC*, 547 F. Supp. 3d 157, 172 (D. Conn. 2021) (quoting *Official Comm. of Unsecured Creditors of WorldCom, Inc. v. SEC*, 467 F.3d 73, 81 (2d Cir. 2006)); *see SEC v. Sargent*, 329 F.3d 34, 42 n.2 (1st Cir. 2003) ("The creation of a new civil penalty was intended to go beyond disgorgement of illegal profits to add the imposition of a significant fine as a needed deterrent." (quoting H.R. Rep. No. 100-910, at 11 (1988))).

[207] *GenAudio*, 32 F.4th at 944 (citing *SEC v. Pentagon Cap. Mgmt. PLC*, 725 F.3d 279, 287 (2d Cir. 2013)); *see SEC v. Escobio*, 833 F. App'x 768, 772 (11th Cir. 2020) (unpublished) ("The statute permits the award of both disgorgement in the amount of the ill-gotten gains and a civil penalty in up to three times the monetary gain for each violation.").

honesty with authorities, if any; and (7) whether the penalty that would otherwise be appropriate should be reduced due to defendants' demonstrated current and future financial condition.[208]

No one factor is dispositive; the court must "assess the totality of the circumstances surrounding the defendant and his violations[.]"[209]

The unchallenged facts show that Mr. Nemeckay's violations warrant a civil penalty. Mr. Nemeckay's conduct was unquestionably egregious. He intentionally defrauded investors, diverting over $1.4 million in investor funds to his personal checking account where he spent the funds on personal expenses such as a mortgage, fitness, luxury vacations, shopping, and adult entertainment.[210] Plus, he diverted $312,000 in investor funds to satisfy restitution for his 2014 Utah securities violations. He acted with scienter by committing these actions willfully.[211] In particular, he made material misrepresentations and omissions over a period of several years, even after state and federal regulators sanctioned him for violating securities laws. Mr. Nemeckay has failed to admit his wrongdoing; indeed, he has not appeared in this action. Next, his fraudulent conduct caused substantial losses to investors: over $1.7 million in investor funds. And he has not cooperated with the Commission or Utah authorities. To the contrary, Mr. Nemeckay lulled investors with false and misleading updates as to Mine Shaft's progress and tried to dissuade investors from cooperating with securities regulators. Last, the court has no information as to Mr. Nemeckay's current financial condition because of his default. In sum, six factors weigh in favor of a civil penalty. The remaining question is what tier is proper.

---

[208] *GenAudio*, 32 F.4th at 954 (quoting *SEC v. Lybrand*, 281 F. Supp. 2d 726, 730 (S.D.N.Y. 2003), *aff'd sub nom. SEC v. Kern*, 425 F.3d 143 (2d Cir. 2005)).
[209] *SEC v. Russell*, No. 22-5093, 2023 WL 4946603, at *2 (9th Cir. Aug. 3, 2023) (not selected for publication) (citing *SEC v. Murphy*, 626 F.2d 633, 655 (9th Cir. 1980)).
[210] Blaylock Decl. ¶ 34.
[211] *See* Compl. ¶¶ 30–70.

The law contemplates three tiers of monetary penalties.[212] Courts may award a third-tier penalty when violations "[1] involve[] fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement; and [2] such violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons."[213] "For a natural person, third-tier penalties may not exceed the greater of $223,229 per violation or the gross amount of pecuniary gain to the person as a result of the violation."[214]

Having considered the totality of the circumstances, a third-tier penalty is appropriate. Mr. Nemeckay's violations involve egregious fraud and reflect a blatant disregard of securities laws. And his violations resulted in substantial losses to many investors. For this and all the reasons discussed, the court awards a civil penalty of $1,707,578.50 for Mr. Nemeckay's federal securities violations—an amount equal to his "gross amount of pecuniary gain."[215]

## ORDER

Accordingly, the court GRANTS IN PART AND DENIES IN PART Plaintiff's Motion for Default Judgments.[216] Pursuant to a separate order and judgment, the court orders that Mine Shaft be permanently enjoined. The court further orders, pursuant to a separate order and judgment, that Mr. Nemeckay be permanently enjoined, liable for disgorgement in the amount of $1,707,578.50, and liable for $1,707,578.50 as a civil penalty. The court DENIES WITHOUT PREJUDICE the Commission's motion as to an award of prejudgment interest.

---

[212] 15 U.S.C. §§ 77t(d)(2), 78u(d)(3)(B).

[213] *Id.* §§ 77t(d)(2)(C), 78u(d)(3)(B)(iii).

[214] *SEC v. Garcia*, No. 1:22-cv-00118, 2023 WL 3976235, at *2 (D. Colo. May 10, 2023) (citing 15 U.S.C. §§ 77t(d)(2)(C), 78u(d)(3)(B)(iii); 17 C.F.R. § 201.1001(b)); *see* Inflation Adjustments to the Civil Monetary Penalties Administered by the SEC (as of Jan. 15, 2023), available at https://www.sec.gov/files/civil-penalties-inflation-adjustments_1_1.pdf (last visited Oct. 3, 2023).

[215] 15 U.S.C. §§ 77t(d)(2)(C), 78u(d)(3)(B)(iii).

[216] ECF No. 62.

Signed October 6, 2023.

BY THE COURT

_____
David Barlow
United States District Judge