THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>    Plaintiff,<br><br>vs.<br><br>MINE SHAFT BREWING, LLC, a Delaware limited liability company; TIMOTHY A. NEMECKAY, an individual; and CHARLIE V. WHITTINGTON, an individual;<br><br>    Defendants. | **ORDER GRANTING IN PART AND DENYING IN PART [99] MOTION FOR REMEDIES AND TO DISMISS WITH PREJUDICE REMAINING CLAIMS AND MEMORANDUM IN SUPPORT**<br><br>Civil No. 2:21-cv-00457-DBB-JCB<br><br>Judge David Barlow |

Before the court is the Securities and Exchange Commission's ("SEC" or "Commission") Motion for Remedies and to Dismiss with Prejudice Remaining Claims and Memorandum in Support ("Motion").[1] For the reasons below, the court grants in part and denies in part the Motion.

## BACKGROUND

Mine Shaft Brewing LLC originally planned to build a brewery and restaurant in Park City, Utah to market malt liquor, beer, and hard cider.[2] Mr. Nemeckay served as Mine Shaft's president, secretary, and board manager.[3] Mr. Whittington was Mine Shaft's senior vice president of business development and was listed on Mine Shaft's Form D as an executive officer.[4]

---

[1] Mot. for Remedies and to Dismiss with Prejudice Remaining Claims and Memorandum in Support ("Mot."), ECF No. 99, filed Oct. 25, 2024.
[2] Mem. Decision and Order Granting Plaintiff's [47] Mot. for Summ. J. ("MSJ Order") 2, ECF No. 63, filed Sept. 21, 2023.
[3] *Id.*
[4] *Id.* at 3.

1

Mr. Nemeckay and Mr. Whittington sought funding for Mine Shaft from investors. Mr. Whittington was a "substantial factor in [Mine Shaft's] sale of securities" and "closely involved in soliciting investors."[5] However, at no time did Mine Shaft file a registration statement as to any securities offerings.[6] And Mr. Whittington never received a license to work in the securities industry, never registered as a broker, and never associated with any entities registered as brokers.[7]

At least 107 individuals invested in Mine Shaft in the total amount of approximately $2.7 million.[8] Mine Shaft spent about $550,000 of the investor funds on business-related expenses.[9] The remaining funds went to Mr. Nemeckay's personal bank account; Mine Shaft investors for repayment; and Mr. Whittington and Mine Shaft's other executive officer, John A. Logan.[10] In particular, Mr. Whittington was paid $255,053.68 from investor funds.[11] And, at least in one instance, Mr. Whittington received a percentage of an investor's contribution to Mine Shaft.[12]

The SEC filed its Complaint against Mine Shaft, Mr. Nemeckay, Mr. Whittington, and Mr. Logan.[13] The SEC brings four causes of action against Mr. Whittington.[14] The SEC previously moved for summary judgment on two out of the four causes of action.[15] The court

---

[5] *See generally id.* at 1–8.
[6] *Id.* at 4 n.22, 13.
[7] *Id.* at 4.
[8] *Id.* at 6.
[9] *Id.*
[10] *Id.*
[11] *Id.*
[12] *Id.* ("After one investor contributed just over $50,000, Mr. Whittington received two percent of the investment.").
[13] *See* Compl., ECF No. 2, filed July 27, 2021.
[14] The four causes of action allege violations of (1) Section 5(a) and 5(c) of the Securities Act for the offer and sale of unregistered securities, (2) Section 17(a) of the Securities Act for fraud in connection with the offer and sale of securities, (3) Section 10(b) of the Exchange Act for fraud in connection with the purchase and sale of securities, and (4) Section 15(a)(1) of the Exchange Act for the offer and sale of securities by an unregistered broker and dealer. *Id.* at 15–18.
[15] Mot. for Summ. J., ECF No. 47, filed Mar. 21, 2023 (moving for summary judgment that Mr. Whittington violated (1) Section 5(a) and 5(c) of the Securities Act and (2) Section 15(a)(1) of the Exchange Act).

granted the SEC's partial motion for summary judgment, holding that Mr. Nemeckay violated (1) Sections 5(a) and 5(c) of the Securities Act for the offer and sale of unregistered securities and (2) Section 15(a)(1) of the Exchange Act for the offer and sale of securities by an unregistered broker or dealer.[16]

Before the court now is the SEC's Motion. The Motion is fully briefed and ready for decision.[17] Oral argument is not necessary to resolve the pending motion.[18]

## DISCUSSION

The SEC seeks dismissal of its two remaining claims against Mr. Whittington and asks the court to (1) enter a final judgment permanently enjoining Mr. Whittington against further violations of Sections 5(a) and 5(c) of the Securities Act and Section 15 of the Exchange Act, (2) order Mr. Whittington to pay disgorgement and prejudgment interest, and (3) impose a civil penalty.

### I. Permanent Injunction

The SEC seeks to permanently enjoin Mr. Whittington from violating Sections 5(a) and 5(c) of the Securities Act and Section 15 of the Exchange Act.[19] Mr. Whittington does not oppose entry of a permanent injunction.[20]

"An injunction based on the violation of securities laws is appropriate if the SEC demonstrates a reasonable and substantial likelihood that the defendant, if not enjoined, will

---

[16] MSJ Order 24.
[17] Mr. Whittington's Brief Regarding Disgorgement Calculation and Penalties or Interest ("Resp."), ECF No. 100, filed Dec. 16, 2024; Reply Brief in Support of Mot. for Remedies and to Dismiss with Prejudice Remaining Claims ("Reply"), ECF No. 101, filed Dec. 27, 2024.
[18] DUCiv-R 7-1(g).
[19] Mot. 5.
[20] Resp. 7.

violate securities laws in the future."[21] Determining the likelihood of future violations "requires analysis of several factors, such as the seriousness of the violation, the degree of scienter, whether defendant's occupation will present opportunities for future violations[,] and whether defendant has recognized his wrongful conduct and gives sincere assurances against future violations."[22] No single factor is determinative of the analysis.[23]

Mr. Whittington committed serious violations of the Securities Act and Exchange Act. Individuals invested approximately $2.7 million in Mine Shaft, and Mr. Whittington was a "substantial factor in [Mine Shaft's] sale of securities."[24] He was also "closely involved in soliciting investors."[25]

Additionally, Mr. Whittington has not recognized his wrongful conduct. For example, in Mr. Whittington's declaration, which was submitted with his opposition to the SEC's Motion for Summary Judgment, Mr. Whittington claimed that he had "never been involved with any company that was trying to raise money."[26] However, as the court noted, "the weight of the evidence cuts against [this] claim."[27] Similarly, Mr. Whittington's declaration claimed he "never proffered advice or valuation."[28] However, the evidence submitted with the SEC's Motion for Summary Judgment demonstrated that Mr. Whittington had made statements such as "[S]hares in Mine Shaft . . . were 'going fast,' and . . . ground breaking on the building would occur soon"; "[T]ake a look at this information. Give me a call if you have any questions"; and "In a nut shell,

---

[21] *S.E.C. v. Pros Int'l, Inc.*, 994 F.2d 767, 769 (10th Cir. 1993).
[22] *Id.*
[23] *Id.*
[24] MSJ Order 13.
[25] *Id.* at 4 n.22.
[26] *Id.*
[27] *Id.*
[28] *Id.* at 4–5 n.27.

$50,000 investment would get you back a little over $1,200,000 with those numbers[.] Not a bad return."[29]

Even though the statutes that Mr. Whittington violated did not require a showing of scienter, the court concludes that these factors indicate that Mr. Whittington is likely to commit future violations.[30] Accordingly, Mr. Whittington is permanently enjoined from committing further violations of Sections 5(a) and 5(c) of the Securities Act and Section 15 of the Exchange Act.

## II.   Disgorgement

The SEC argues that the court should order disgorgement and prejudgment interest against Mr. Whittington.[31]

The court may grant "any equitable relief that may be appropriate or necessary for the benefit of investors."[32] One such form of relief is disgorgement. "[D]isgorgement is a form of '[r]estitution measured by the defendant's wrongful gain.'"[33] "Courts may not enter disgorgement awards that exceed gains 'made upon any business or investment, when both the receipts and payments are taken into the account.' Accordingly, courts must deduct *legitimate* business expenses before ordering disgorgement . . . ."[34] When determining whether business expenses are legitimate courts consider whether the expenses "have value independent of fueling

---

[29] *Id.*
[30] The briefing does not provide Mr. Whittington's present occupation, so the court cannot assess whether Mr. Whittington's occupation will present opportunities for future violations.
[31] Mot. 8–11.
[32] 15 U.S.C. § 78u(d)(5).
[33] *SEC v. GenAudio, Inc.*, 32 F.4th 902, 944 (10th Cir. 2022) (quoting *Kokesh v. SEC*, 581 U.S. 455, 459 (2017)); *see Liu v. SEC*, 591 U.S. 71 (2020) (holding that courts may enter a disgorgement award "that does not exceed a wrongdoer's net profits").
[34] *Liu*, 591 U.S. at 91–92 (emphasis added).

a fraudulent scheme."[35] "[W]hen the 'entire profit of a business or undertaking' results from the wrongdoing, a defendant may be denied 'inequitable deductions' such as for personal services. [This] exception requires ascertaining whether expenses are legitimate or whether they are merely wrongful gains 'under another name.'"[36]

The SEC bears the initial burden to produce a reasonable approximation of the ill-gotten gains.[37] If the SEC does so, the burden shifts to the defendant "to demonstrate [that] the SEC's estimate is not reasonable."[38] The court resolves any ambiguity against the "wrongdoer whose illegal conduct created th[e] uncertainty."[39]

To calculate a disgorgement amount, the SEC took "the total amount that [Mr.] Whittington received from Mine Shaft and [Mr.] Nemeckay and deduct[ed] the expenses incurred by [Mr.] Whittington that were not directly related to his efforts to sell the unregistered Mine Shaft securities."[40]

Here, counsel for the SEC determined that Mr. Whittington received $236,115.93.[41] The SEC then looked at a list of business expenses provided by Mr. Whittington.[42] These expenses

---

[35] *Id.* at 92.
[36] *Id.*
[37] *SEC v. Camarco*, No. 19-1486, 2021 WL 5985058, at *16 (10th Cir. Dec. 16, 2021) (unpublished) (quoting *U.S. Commodity Futures Trading Comm'n v. Tayeh*, 848 F.App'x 827, 828 (11th Cir. 2021) (unpublished)).
[38] *SEC v. Levin*, 849 F.3d 995, 1006 (citation omitted); *accord SEC v. CMKM Diamonds, Inc.*, 729 F.3d 1248, 1261 (9th Cir. 2013); *SEC v. Gordon*, 822 F.Supp.2d 1144, 1158 (N.D. Okla. 2011), *aff'd*, 522 F.App'x 448 (10th Cir. 2013) (unpublished).
[39] *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1232 (D.C. Cir. 1989); *accord SEC v. Lorin*, 76 F.3d 458, 462 (2d Cir. 1996); *SEC v. Koenig*, 532 F.Supp.2d 987, 994 (N.D. Ill. 2007), *aff'd in part and remanded*, 557 F.3d 736 (7th Cir. 2009); *Marcus v. Allied World Ins. Co.*, 384 F.Supp.3d 115, 121 (D. Me. 2019).
[40] Mot. 9–10.
[41] *Id.* at 10.
[42] *Id.*

were split into five categories: (1) $57,424 on entertainment; (2) $19,245 on a car; (3) $85,258 on an office; (4) $6,830 on travel; and (5) $2,962 on doctors.[43]

The SEC determined the expenses for doctors should not be deducted because there was no basis for concluding that these expenses constituted business expenses.[44] With respect to the expenses spent on entertainment, a car, and travel, the SEC argues that these categories "were directly related to [Mr.] Whittington's solicitation of investments in Mine Shaft, and thus do not constitute business expenses" because "deductible expenses include those that have value 'independent of fueling a fraudulent scheme.'"[45] Lastly, of the $85,258 in office expenses claimed by Mr. Whittington, the SEC argues that only $75,900 (the amount used to maintain a home office and a cell phone) constitute legitimate expenses that are deductible.[46] Based on these deductions, the SEC requests that the court order Whittington to pay $160,215.93 in disgorgement.[47] The SEC supports its arguments with a signed declaration and detailed exhibits of Mr. Whittington's expenditures.[48]

Based on the signed declaration and detailed exhibits submitted by the SEC as well as the explanation of the deductions in the SEC's briefing, the SEC has met its initial burden of producing a reasonable approximation of Mr. Whittington's ill-gotten gains. The SEC's proposed deductions for business expenses are reasonable because expenses for doctors clearly do not appear to be business expenses, and the money Mr. Whittington spent on entertainment, a

---

[43] *Id.*
[44] *Id.* at 10–11.
[45] *Id.* at 11.
[46] *Id.*
[47] *Id.* at 9.
[48] *See* Decl. of Kristin Murnahan ("Murnahan Decl."), ECF No. 99-1, filed Oct. 25, 2024 (containing exhibits detailing Mr. Whittington's expenses).

car, travel, and office expenses (other than his cell phone and home office) stemmed from his violative conduct of offering and selling unregistered securities as an unregistered broker. Thus, they were not independent of a fraudulent scheme. Because the SEC has met its initial burden, the burden shifts to Mr. Whittington to demonstrate that the SEC's calculations are not reasonable.

For his part, Mr. Whittington contends that disgorgement is not appropriate here because "all funds Mr. Whittington received from Mr. Nemeckay were reimbursements for legitimate business expenses."[49] Mr. Whittington explains that the documentation submitted by the SEC demonstrates that "what was transferred to Mr. Whittington was almost entirely reimbursement for his expenses" and should be deducted as legitimate business expenses.[50]

Contrary to Mr. Whittington's argument that "all funds [he] received from Mr. Nemeckay were reimbursements for legitimate business expenses," the court has already concluded that, at least in one instance, Mr. Whittington received a percentage of an individual's investment in Mine Shaft.[51] And in Mr. Whittington's declaration submitted at summary judgment he admitted that "he received other payments 'not related to expenses," such as "reimbursements . . . for a membership at a country club and for tickets to a golf tournament."[52] So not all funds were business expenses as Mr. Whittington suggests.

Additionally, Mr. Whittington's assertion that the funds he received were reimbursements for business expenses does not end the inquiry as to whether these funds are deductible. The

---

[49] Resp. 4.
[50] *Id.* at 5.
[51] MSJ Order 6 ("After one investor contributed just over $50,000, Mr. Whittington received two percent of the investment.").
[52] *Id.* at 6 n.44.

funds must be legitimate business expenses to be deductible. And when the "entire profit of a business or undertaking results from the wrongdoing" or the expenses were not "independent of a fraudulent scheme," a defendant may be denied those deductions.[53]

Mr. Whittington was offering or selling Mine Shaft's unregistered securities as an unregistered broker or dealer. His expenses on a car, entertainment, travel, and certain office expenses do not have value independent of fueling a fraudulent scheme; he would not have received the reimbursements absent his violative conduct. These are not legitimate deductible business expenses. There does not appear to be any ambiguity here, but to the extent there is any ambiguity in whether certain transactions were legitimate business expenses, the court resolves the ambiguity against Mr. Whittington.[54] Accordingly, Mr. Whittington has failed to show that the SEC's disgorgement calculation is not reasonable.[55]

The SEC also seeks an award of prejudgment interest. Mr. Whittington opposes a pre-judgment interest award.[56] "The decision whether to grant prejudgment interest and the rate used if such interest is granted are matters confided to the district court's broad discretion[.]"[57] A court should consider "(i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant

---

[53] *Liu*, 591 U.S. at 92.
[54] *First City Fin. Corp.*, 890 F.2d at 1232 (explaining that the court should resolve ambiguity against the "wrongdoer whose illegal conduct created th[e] uncertainty"); *accord Lorin*, 76 F.3d at 462; *Koenig*, 532 F.Supp.2d at 994; *Marcus*, 384 F.Supp.3d at 121.
[55] Mr. Whittington also attaches three exhibits and argues that "[e]ach of these documents reveals that the funds paid to Mr. Whittington were expenses that are not recoverable through disgorgement." Resp. 4. Mr. Whittington does not develop this argument or explain how these exhibits demonstrate that that the expenses paid to Mr. Whittington are not recoverable through disgorgement. Accordingly, the court rejects this argument.
[56] *Id.* at 7.
[57] *SEC v. Ahmed*, 72 F.4th 379, 403 (2d Cir. 2023) (citation omitted); *accord SEC v. Intelliquis Int'l*, No. 2:02-CV-674 PGC, 2003 WL 23356426, at *16 (D. Utah Dec. 11, 2003).

by the court."[58] "The most significant factor in awarding prejudgment interest is the remedial purpose to be served by the securities laws, recognizing that requiring interest avoids 'what amounts to an interest free loan procured as a result of illegal activity.'"[59] The applied interest rate is the Internal Revenue Service's underpayment rate pursuant to 26 U.S.C. § 6621(a)(2).[60] "This rate thus reflects 'use value,' or unearned interest that the rightful owner of the funds could have received but for the fraud."[61]

Considering the above factors, the court finds an award of prejudgment interest appropriate. Mr. Whittington was involved in Mine Shaft's sale of securities and soliciting of investors. While acting as an unregistered broker or dealer and selling or offering unregistered securities, Mr. Whittington received ill-gotten gains, such as when he received a percentage of an individual's investment. An award of interest will thus help compensate investors for their losses. The court determines the proper amount is $8,276.00, running from February 1, 2020, to June 30, 2021.[62]

---

[58] *SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1476 (2d Cir. 1996).
[59] *SEC v. Autocorp Equities, Inc.*, 292 F.Supp.2d 1310, 1330 (D. Utah 2003) (quoting *SEC v. Moran,* 944 F.Supp.286, 295 (S.D.N.Y. 1996)).
[60] *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1099 (9th Cir. 2010) (citing SEC Rules and Regulations, 60 Fed. Reg. 32,738, 32,788 (June 23, 1995) (codified at 17 C.F.R. § 201.600(b))); *accord SEC v. Erwin*, No. 13-cv-03363, 2020 WL 7310584, at *5 (D. Colo. Dec. 11, 2020).
[61] *Ahmed*, 72 F.4th at 404.
[62] *See* Murnahan Decl. ¶ 16. Mr. Whittington also argues that (1) disgorgement is not appropriate when investors have already been reimbursed, and given that at least $277,000 of the funds raised by Mine Shaft were used to reimburse prior Mine Shaft note holders and Mr. Nemeckay was ordered to pay restitution, "it must be assumed that some of [the Mine Shaft] investors have already been fully reimbursed"; and (2) disgorgement is not appropriate because the SEC cannot show the disgorged funds will be used for the benefit of victims. The court rejects the first argument because Mr. Whittington has not submitted any evidence showing that investors have been made whole or that Mr. Nemeckay has fulfilled any of his restitution obligations. The court rejects the second argument because the SEC asserts that the disgorgement will be for the benefit of the investors and in the SEC's proposed order, the SEC requests that the court order the creation of a Fair Fund that will allow the court to determine how any money collected from Mr. Whittington will be distributed to investors.

**III. Civil Penalty**

The SEC asks the court to impose a civil penalty against Mr. Whittington. "Congress enacted the civil penalties provisions 'to further the dual goals of punishment of the individual violator and deterrence of future violations,' finding 'that disgorgement insufficiently deters securities laws violations because it merely restores the *status quo ante.*'"[63] The court has wide discretion in entering a civil penalty.[64] Courts typically consider several factors:

> (1) the egregiousness of the violations at issue, (2) defendants' scienter, (3) the repeated nature of the violations, (4) defendants' failure to admit to their wrongdoing; (5) whether defendants' conduct created substantial losses or the risk of substantial losses to other persons; (6) defendants' lack of cooperation and honesty with authorities, if any; and (7) whether the penalty that would otherwise be appropriate should be reduced due to defendants' demonstrated current and future financial condition.[65]

No one factor is dispositive; the court must "assess the totality of the circumstances surrounding the defendant and his violations[.]"[66]

The SEC requests that the court impose a tier-one penalty for each statute violated by Mr. Whittington, which, after adjusting for inflation, is $11,524 per statute.[67] The SEC argues that imposing such a penalty is consistent with the approach that other courts have taken in cases involving similar violations.[68]

---

[63] *SEC v. Westport Cap. Markets, LLC*, 547 F.Supp.3d 157, 172 (D. Conn. 2021) (quoting *Official Comm. of Unsecured Creditors of WorldCom, Inc. v. SEC* , 467 F.3d 73, 81 (2d Cir. 2006)); *see SEC v. Sargent*, 329 F.3d 34, 42 n.2 (1st Cir. 2003) ("The creation of a new civil penalty was intended to go beyond disgorgement of illegal profits to add the imposition of a significant fine as a needed deterrent." (quoting H.R. Rep. No. 100-910, at 11 (1988))).
[64] *GenAudio*, 32 F.4th at 944 (citing *SEC v. Pentagon Cap. Mgmt. PLC*, 725 F.3d 279, 287 (2d Cir. 2013)).
[65] *Id.* at 954 (quoting *SEC v. Lybrand*, 281 F.Supp.2d 726, 730 (S.D.N.Y. 2003), *aff'd sub nom. SEC v. Kern*, 425 F.3d 143 (2d Cir. 2005)).
[66] *SEC v. Russell*, No. 22-5093, 2023 WL 4946603, at *2 (9th Cir. Aug. 3, 2023) (unpublished) (citing *SEC v. Murphy*, 626 F.2d 633, 655 (9th Cir. 1980)).
[67] Mot. 12; *See* Release Nos. 33-11263; 34-11263; 34-99276; IA-6521; IC-35085, dated Jan. 5, 2024 (effective Jan. 15, 2024).
[68] Mot. 12.

Mr. Whittington argues that none of the factors weigh in support of awarding civil penalties because he "was a tangential player in this investment scheme," "cooperated with [the] DOJ early and his honest revelations played a significant role in resolving the criminal case," and "has no money or assets."[69]

The first factor is the egregiousness of the violations at issue. Mr. Whittington was closely involved in soliciting investors for Mine Shaft and was a substantial factor in the selling of Mine Shaft's securities. Mr. Whittington was not a registered broker and the Mine Shaft securities were unregistered. This factor weighs in favor of imposing a civil penalty.

Second, the court must consider Mr. Whittington's scienter. Both of the statutes Mr. Whittington violated did not require a showing of scienter. Accordingly, this factor does not favor or disfavor the imposition of a civil penalty.

Third, the court looks at the repeated nature of the violations. Mr. Whittington acted as an unregistered dealer selling unregistered securities for six years.[70] Mr. Whittington's violations were repeated and continuous, so this factor weighs in favor of imposing a civil penalty.

Fourth, the court considers whether Mr. Whittington admitted to his wrongdoing. At the summary judgment stage, Mr. Whittington's declaration repeatedly made representations that were inconsistent with the evidence presented.[71] And in the present motion, Mr. Whittington

---

[69] Resp. 7.
[70] MSJ Order 4.
[71] *See, e.g.,* MSJ Order 3 n.18 ("In his affidavit, Mr. Whittington claims he was never a board member or executive officer. But his denial does not create a genuine dispute of material fact given Mr. Whittington's prior admission, the declarations, and marketing materials cited herein. In fact, he admitted in his Answer that Mine Shaft marketing materials listed him as a founding member and senior vice president of business development. Mr. Whittington cannot simply contradict his prior judicial admission with a general denial, particularly when overwhelming evidence supports the admission." (citations omitted)); *id.* at 4 n.22 ("Mr. Whittington claims that he has 'never been involved with any company that was trying to raise money.' But the weight of the evidence cuts against his claim."); *id.* at 4 n.27 (concluding that given certain statements, Mr. Whittington's unsupported claim he 'never proffered advice or valuation' does not raise a genuine dispute" (citations omitted)); *id.* at 6 n.43 ("Mr. Whittington avers he

continues to downplay his role at Mine Shaft by stating that he was only "a tangential player in this investment scheme" even though the court has already concluded that he played a substantial role. As such, the fourth factor weighs in favor of imposing a civil penalty.

The fifth factor requires examining whether Mr. Whittington's conduct created substantial losses or the risk of substantial losses to other persons. Mine Shaft raised $2.7 million from investors. Of the $2.7 million, only $550,000 was spent on business-related expenses. Mr. Whittington's conduct of soliciting investors for these unregistered securities created a risk of substantial losses to the investors. This factor weighs in favor of imposing a civil penalty.

Sixth, the court must assess whether Mr. Whittington cooperated and was honest with authorities. Mr. Whittington represents in his brief that he has been honest and forthcoming.[72] Mr. Whittington states that "[a]s a component of his cooperation with the Department of Justice and the State Securities Division, Mr. Whittington entered into a stipulated agreement with the State of Utah. As a part of this process, Mr. Whittington agreed to allow the State division unfettered access to all of his financial records."[73] The court is not privy to the agreements reached between the state and Mr. Whittington. However, for the purposes of this analysis, the court will assume that Mr. Whittington has cooperated and been honest with the state authorities.

Consideration of these six factors demonstrate that it is appropriate to impose a civil penalty. The seventh, and last factor, requires the court to consider whether a civil penalty that

---

received only 'reimbursement and other payment from [Mine Shaft] . . . related to charges incurred . . . at Mr. Nemeckay's direction.' Yet he admits he received other payments 'not related to expenses.' Two specific reimbursements were for a membership at a country club and for tickets to a golf tournament." (citations omitted)).
[72] Resp. 2.
[73] *Id.*

would otherwise be appropriate should be reduced due to Mr. Whittington's demonstrated current and future financial condition.

Mr. Whittington states in his briefing that he "has no financial resources," "cannot afford to hire counsel[,] and "has no ability to pay a judgment."[74] Mr. Whittington cites his counsel's previously-submitted Motion to Withdraw, which included an affidavit from Mr. Whittington detailing his financial condition and inability to pay counsel. When the court granted Mr. Whittington's counsel's Motion to Withdraw, the court entered an order requesting pro bono counsel for Mr. Whittington. Pro bono counsel is appropriate in certain circumstances when a "person [is] unable to afford counsel."[75]

Based on the briefing, the Motion to Withdraw, Mr. Whittington's declaration in support of the Motion to Withdraw, and the court's previous request for pro bono counsel, Mr. Whittington has demonstrated that he would be unable to pay a civil penalty imposed by the court. Accordingly, even though the other factors weigh in favor of imposing a civil penalty, the court declines to do so in this instance given Mr. Whittington's financial condition.

## CONCLUSION

For the reasons stated, the court grants in part and denies in part the SEC's Motion for Remedies and to Dismiss with Prejudice Remaining Claims and Memorandum in Support.[76] Counts II and III of the SEC's complaint are dismissed with prejudice. Mr. Whittington is ordered to pay $160,215.93 in disgorgement and $8,276.00 in prejudgment interest.

---

[74] *Id*.
[75] Order Requesting Pro Bono Counsel 2, ECF No. 52, filed Apr. 6, 2023.
[76] ECF No. 99.

Signed March 6, 2025.

BY THE COURT:

_____
David Barlow
United States District Court Judge